351 F.2d 824
 The LORAIN JOURNAL COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Elyria-Lorain Broadcasting Company, Intervenor.
W.W.I.Z., INC., and Sanford A. Schafitz, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Elyria-Lorain Broadcasting Company, Intervenor.
 No. 18955.
 No. 18957.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 12, 1965.
 Decided September 8, 1965.
 
 Mr. Clair L. Stout, Washington, D. C., with whom Mr. L. Adrian Roberts, Washington, D. C., was on the brief, for appellant in No. 18,955.
 Mr. Carl L. Shipley, Washington, D. C., with whom Mr. Thomas A. Ziebarth, Washington, D. C., was on the brief, for appellants in No. 18,957.
 Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and Ernest O. Eisenberg, Counsel, Federal Communications Commission, were on the brief, for appellee. Messrs. Daniel R. Ohlbaum, Deputy General Counsel, and Howard Jay Braun, Counsel, Federal Communications Commission, also entered appearances for appellee.
 Mr. Marcus Cohn, Washington, D. C., with whom Mr. Stanley S. Neustadt, Washington, D. C., was on the brief, for intervenor. Mr. Stanley B. Cohen, Washington, D. C., also entered an appearance for intervenor.
 Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 These consolidated cases involve appeals[1] by The Lorain Journal Company (Journal)[2] in Case No. 18,955, and by W.W.I.Z., Inc. (WWIZ, Inc.) and Sanford A. Schafitz (Schafitz) in Case No. 18,957, from the decision of the Federal Communications Commission (Commission) of March 25, 1964, denying both the application of WWIZ, Inc. filed July 5, 1961, for renewal of license of Station WWIZ, Lorain, Ohio, and an application filed June 5, 1961, for transfer of control of WWIZ, Inc. from Schafitz to Journal. They also appeal from the Commission's order of September 16, 1964, denying appellants' petitions for rehearing and reconsideration.
 
 
 2
 The Commission concluded that the activities of Schafitz and Journal, recounted in detail in the Commission's findings of fact, had resulted in a transfer of actual control of WWIZ, Inc. to Journal without the prior consent of the Commission, and that Schafitz' filing of misinformation and withholding of information in regard to these matters had constituted a clear breach of his duties and responsibilities to the Commission.[3] We are of the opinion that the Commission's conclusions were amply supported by underlying findings of fact, in turn predicated upon substantial evidence of record. We summarize these findings though our condensation loses much of the flavor of the transactions imparted by the Commission's extended development.
 
 
 3
 In September 1958, Schafitz was advised by Harry Horvitz, Journal's president, that Journal desired to obtain an interest in Station WWIZ, for which Schafitz had received a construction permit on May 7, 1958.[4] There was some discussion concerning purchase of the entire station, which Schafitz valued at $125,000. But Horvitz did not press for this since he believed it might prejudice a then-pending effort by Mansfield Journal Company to acquire the assignment of license of Station WCLW at Mansfield, Ohio,[5] and because he did not wish to afford Elyria-Lorain Broadcasting Company, an unfriendly competitor,[6] an opportunity to force a lengthy Commission hearing on a transfer of control of WWIZ. A hearing would have delayed any payment to Schafitz whose interest in the transaction was whetted by his immediate need for $55,000 to put his Station WXTV, Youngstown, on the air. Since Horvitz was unwilling to pay $55,000 for a minority interest, they reached an understanding that Schafitz would organize a corporation in which Journal would hold the preferred stock and 45% of the common stock. The corporation was organized following the plan outlined by Journal's attorney.
 
 
 4
 On September 18, 1958, pursuant to such plan, Schafitz filed with the Commission an application seeking assignment of the WWIZ construction permit from himself to a corporation (WWIZ, Inc.) in which he was, so far as the Commission was advised, to be the 100% stockholder. Asked by the form for a "full narrative statement of the circumstances leading to the assignment (or transfer) and the reasons therefor" and for a table showing the disposition of the stock before and after the assignment he replied:
 
 
 5
 This is an application to change from an individual permittee to a corporation permittee. All of the stock of the corporation is held by the present permittee, Sanford A. Schafitz. No other stockholders or persons are involved in the ownership of the new corporation. The assignee is WWIZ, Inc., an Ohio corporation. It is authorized for 200 shares, of which 110 will be issued to Sanford A. Schafitz, and 90 will remain in the Corporation.
 
 
 6
 The purpose of the assignment to a corporation is to take advantage of its legal rights and privileges which are well known to the law.
 
 
 7
 Shortly after the Commission approved the assignment to WWIZ, Inc., on October 15, 1958, Schafitz acquiesced in changes in the charter and by-laws demanded by Horvitz which effectively deprived Schafitz of majority control by vesting certain key decision-making authority in a two-thirds majority vote of the common stock and in a three man board of directors consisting of Horvitz, Schafitz and Wickens, referred to below; by requiring on all checks a cosignature representing Journal's interests; and by converting the preferred to a $100 par 6% cumulative participating preferred which gave Journal dividends each year of $1200 plus 72.5% of all other dividends declared. In addition to these legal changes, WWIZ books were kept by Journal staff and at the offices of Journal.
 
 
 8
 The Commission stated that it considered the Examiner's contrary findings as to transfer of control to be lacking in major aspects. It examined at length and in depth the three factors emphasized by the Examiner as indicating that the developments only constituted steps of a minority owner to safeguard its investment:
 
 
 9
 (a) The first was the fact that Wickens, the third director, was a responsible attorney and not a mere creature of Journal. The Commission noted that in fact, Wickens' participation in the affairs of the Corporation was pro forma, since Horvitz obtained Schafitz' agreement in advance to any proposals he desired; and moreover emergence of Wickens as director tended to complete the pattern of Schafitz' divestiture of control, since normally a majority owner would select his own counsel as director, while Wickens had been a total stranger to Schafitz prior to his being designated at Horvitz' suggestion as statutory agent, but had done legal work for Journal in the past and listed Journal as one of his representative clients in the Martindale-Hubbell Law Directory.
 
 
 10
 (b) While the Examiner found that the keeping of the books by the Journal staff saved WWIZ, Inc. trouble and expense and was merely a device to enable a substantial minority owner to keep close scrutiny of controlling owner's management, the Commission concluded that the arrangements went beyond normal business practice for mere minority protection and resulted in control passing to Journal by means of its hold on the corporation's pursestrings. The Commission emphasized that the co-signature requirement provided Horvitz with constant information as to receipts and expenditures; in practice the Journal staff withheld checks for unusual expenditures pending Horvitz' approval; this was in a background whereby Journal actually provided the initial operating capital of WWIZ, Inc., starting with $5,000 advanced on October 22, 1958, shortly after Schafitz orally agreed to the Horvitz changes; and Journal in essence paid the costs of station construction by reimbursements to Schafitz.
 
 
 11
 (c) The Examiner found that actual conduct of business and broadcast operations remained with Schafitz. This was true for the first six months of operations, but subsequently, the Commission noted, Schafitz gave the station only half his time, for about five months, less thereafter, and no time whatever by May 1960. As appellee aptly remarks, Schafitz acted like a man who had relinquished control and was awaiting a propitious time to sell out his stock holdings, while Horvitz' attitude was that of a proprietor steadfastly attending to business.
 
 
 12
 We have carefully examined the Commission's consideration of the Examiner's views because of the claim of appellant Journal that the Commission had failed to give sufficient weight to the Examiner's findings under the standard of Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We are fully appreciative of the importance of the contribution of the hearing examiners to the maintenance of the rule of law in the decisions of administrative agencies. But their authority to render initial decisions does not mean that the various boards and commissions are relegated to the role of reviewing courts who sustain fact findings of courts of first instance unless clearly erroneous. FCC v. Allentown Broadcasting Corp., 349 U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). The responsibility for decision is placed in the Commissioners appointed by the President and confirmed by the Senate to discharge the function of administering the statutes under the agency's cognizance.
 
 
 13
 The agency heads must take the decision of the examiner into account. Indeed, we have only recently remanded a board decision which changed the decision rendered by the examiner without adequate showing of the basis on which it rejected the examiner's conclusion. Retail Store Employees Union v. NLRB, No. 19051, decided July 13, 1965. But the foregoing recital clearly shows that in this case the Commission did study and address itself to the salient conclusions and reasoning of the Examiner. Thereafter, it is for the agency to draw its own inferences and reach its own conclusions for implementing the statutory mandate. The agency's conclusions must be sustained if supported by substantial evidence even though there is also substantial evidence to support the contrary conclusion of the examiner. The Examiner's report is entitled only to "such probative force as it intrinsically commands" (see 340 U.S. at 495, 71 S.Ct. at 468). In this case, even assuming that the Examiner's report reflects a plausible view of the evidence, it does not negative the Commission's conclusions as a permissible view of the significance of the facts shown by the evidence. There are indeed items of evidence supporting the Examiner's conclusion. There are also countervailing factors. It is for the Commission to measure the force of the various vectors and to chart the resultant in the parallelogram of forces.
 
 
 14
 In dealing with concepts like "control" or its transfer we are concerned with a subject matter where useful perspective is gained from experience in business operations and the affairs of the world at large, and where particularly insightful judgments may be provided by the agency heads who have the benefit of the views of the agency's technicians and examiners without the requirement of according them total deference.
 
 
 15
 Appellants' arguments are colored by underlying suppositions that the transfers interdicted are of legal control or conditions approximating legal control. Section 310(b) of the Communications Act of 1934, as amended, speaks in broad terms in its prohibition of transfer of license or of control of any corporation holding a license except on application to the Commission and a finding that the public interest will be served thereby.[7] We agree with the Commission that the statute is to be implemented in accordance with the agency's interpretation that passage of control need "not be legal control in a formal sense, but may consist of actual control by virtue of the special circumstances presented." Town and Country Radio, Inc., 15 Pike & Fischer R.R. 1035, at 1057 (1960), and decisions cited. This view is in accord with court decisions under other statutes.[8] The Commission's findings of transfer of control, supported by substantial evidence, suffice to show a violation of the statute, and an implication of all the appellants in responsibility therefor.
 
 
 16
 There is also evidentiary support for the Commission's conclusion that Schafitz' application to assign the construction permit to WWIZ, Inc., and its amendment, failed to contain any information concerning the actual purpose underlying the formation of the corporation, namely to enable Journal to acquire a substantial interest therein, and reflected a failure to exercise the candor the Commission must demand from its licensees and a clear breach of Schafitz' responsibilities to the Commission.[9] Schafitz' response as to the circumstances leading to the assignment to WWIZ, Inc. was hardly the "full narrative statement" specified by the Commission's form. Together with his submissions regarding the financing of WWIZ, Inc., there is justification for the Commission's findings that Schafitz' lack of licensee responsibility in allowing control of the station to slip from his hands without approval was compounded by filing of misinformation and withholding of information. Indeed, these departures from the responsibility of disclosure are evidentiary of the de facto shift in control contemplated by the parties. The best that can be said for Schafitz is that he was desperate for money and was trying, in vain it developed, to save his television station in Youngstown. But of course that does not justify bypassing the public interest in Lorain.
 
 
 17
 Ownership Reports were filed by appellants in November 1958, and February 1959, setting forth the issuance to Journal first of 200 shares of preferred stock and later of 90 shares of common stock. These relatively routine ownership reports showing the sale of stock in a licensee corporation call for no action by the Commission, though they are on file and can be examined by the press and interested parties when and if occasion arises. They plainly do not discharge the responsibility imposed by statute and regulations for initiating requests for the consent required where a sale is part of a factual transfer of control. The Commission expressly warned the industry of this in its Public Notice on Procedure of Transfer and Assignment of Licenses, 4 Pike & Fisher, R.R. 342 (1948), where it also advised that in doubtful and borderline cases, as to whether a proposed transaction would result in a transfer of control within the meaning of Section 310(b), doubt should be resolved by bringing the complete facts of the proposed transaction to the Commission's attention for a ruling in advance of any consummation of the transaction. The Commission was not asked by appellants for its determination until 1961, when Schafitz contracted to sell his remaining 110 shares of common stock to Journal, and the application for transfer of control was filed.
 
 
 18
 Counsel for appellants WWIZ, Inc. and Schafitz argue that the non-disclosure finding was pumped up out of all proportion to its real significance, that this is a statute based on private ownership and is not a general disclosure statute like those administered by the Securities and Exchange Commission. It is the genius of our system that instead of government ownership we retain the spark of private profit and the drive of private enterprise, maintained under government surveillance at critical pressure points of regulatory policy. We do not welcome a gigantic bureaucracy second-guessing corporate management on details. But it is needful that the regulatory agencies be alerted and fairly and fully informed upon the emergence of a situation identified as a pressure point by law or regulation.
 
 
 19
 A cardinal assumption of the regulatory system is undercut by a pattern of false or evasive reports. That misrepresentation or concealment of the true conditions as to underlying ownership is adequate ground for denial of renewal of license was established in FCC v. WOKO, Inc., 329 U.S. 223 (1946), where Justice Jackson remarked (p. 227, 67 S.Ct. 213, p. 215, 91 L.Ed. 204): "The fact of concealment may be more significant than the facts concealed."
 
 
 20
 Counsel also argue that businessmen can not be held to a standard of conduct as sophisticated as that which may be reasonably demanded of a lawyer. Even businessmen are held to high standards of punctilio when they are in positions of joint venture. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928). It does not seem too much to ask that federal licensees be scrupulous in providing complete and meaningful information provided for in forms and regulations. But this case does not involve difficult philosophical questions for even relatively low standards of disclosure would be violated by the submissions depicted in this record.
 
 
 21
 Furthermore, it should be noted that the Commission also rested denial of the renewal application on Schafitz' lack of licensee responsibility as evidenced by his inattention to the station and its operation in violation of Commission rules — specifically the failure to employ a first-class radio telephone operator, fictitious logging and failure to discontinue remote operation when the remote meters were not functioning. The findings of these violations do not appear to be seriously contested and in any event are supported by substantial evidence.[10]
 
 
 22
 Counsel contends the non-renewal of the license is a wholly disproportionate sanction, particularly for the operating violations, and suggests that the monetary penalty power recently made available to the Commission[11] should suffice for such minor transgressions. The transgressions reviewed above are not to be dismissed as merely venial sin. We can not properly examine the violations one at a time and seek to determine the proper sanction therefor. The Commission was called upon to consider the entire fact situation. As WOKO makes clear, the choice of remedies and sanctions is a matter wherein the Commission has broad discretion. We see nothing to warrant judicial intervention here on the ground that this discretion has been abused.
 
 
 23
 Appellants also argue that non-renewal of the license will be injurious to the public which will be deprived of the station and its service to the community. This is peculiarly a consideration to be addressed to the discretion and judgment of the Commission and not of this court.[12] We would hesitate to say the Commission was required to provide irresponsible service as better for the public than no service. But there is no reason to suppose the Commission was faced with that dilemma. While it may not be strictly a matter of judicial notice we may open our eyes to the facts of life sufficiently to postulate as a possible factor supporting the presumption of validity of its actions, unless negatived by some showing of record, that the Commission may reasonably have forecast that applications for the vacated frequency will not be in short supply.
 
 
 24
 Sundry other contentions of the appellants have been duly examined. We find no basis for reversal.
 
 
 25
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The appeals are brought under Section 402(b) (1), (2), (3) and (6) of the Communications Act of 1934, as amended, 47 U.S.C. § 402(b) (1), (2), (3) and (6)
 
 
 [2]
 We agree with Journal and the Commission that Journal's standing is not mooted by Shafitz' announcement that he was withdrawing from his contract to sell his stock to Journal
 
 
 [3]
 That decision is reported in 36 F.C.C. 561, 2 R.R.2d 169 (1964)
 
 
 [4]
 Sanford A. Schafitz, 24 F.C.C. 363, 14 R.R. 852 (1958)
 
 
 [5]
 The Commission had previously found the publisher of The Lorain Journal newspaper, and the Mansfield Journal Company, under common ownership with Journal, not qualified to hold broadcast licenses because of certain activities directed toward suppressing competition in the dissemination of news and information. Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950)
 The activities of the Journal in suppressing competition resulted in its being subjected to a successful prosecution for violation of the Sherman Antitrust Act. See United States v. Lorain Journal Co., 92 F.Supp. 794 (N.D. Ohio, 1950); affirmed sub nom. Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).
 
 
 [6]
 Elyria-Lorain Broadcasting Company intervened in the Commission proceeding and on the appeal to this court, playing an active role in pointing up significant aspects of the case. It opposed the transfer to the Journal, but did not take a position on the application of WWIZ, Inc. for renewal
 
 
 [7]
 Section 310(b), 47 U.S.C. § 310(b) provides in pertinent part as follows: "No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. * * *"
 
 
 [8]
 Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L. Ed. 1147 (1939); Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 163-165, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957); American Gas & Electric Co. v. SEC, 77 U.S. App.D.C. 174, 134 F.2d 633 (1934), cert. denied, 319 U.S. 763, 63 S.Ct. 1318, 87 L.Ed. 1713 (1943). Appellants WWIZ, Inc. and Schafitz observe that these cases involve corporate giants with diffuse ownership of voting stock. For such corporations it is easier to show factual control in a minority stockholder, but as a matter of principle the cases do negative the need to show legal control
 
 
 [9]
 We quote from the Commission's decision (see 2 R.R.2d at 191-92): "For example, the application as filed stated that WWIZ, Inc. was being formed `to take advantage of its legal rights and privileges which are well known to the law.' In actuality, it was being formed by Schafitz to implement the plan of Horvitz and Kane whereby the Journal could place in the hands of Schafitz $55,000 for his immediate use in connection with the construction of WXTV, in return for which the Journal could obtain an interest in the Lorain radio station without flagging the attention of the Commission or its long-standing opponent Elyria-Lorain Broadcasting Company. Further, in such assignment application, Schafitz expressly represented (a) that `There are no contracts, agreements or understandings by which the stock is transferred'; (b) that `no other stockholders or persons involved in the ownership of the new corporation'; and (c) that `the corporation is authorized for 200 shares, of which 110 will be issued to Sanford A. Schafitz and 90 will remain in the corporation.' Contrary to these express representations, the 55-45% split of common stock which was ultimately utilized had already been discussed at this time as had the Journal's preferred stock ownership. Additionally, when this application was amended on September 30, 1958, Schafitz submitted a statement representing that the station would be constructed and operated with funds and equipment furnished by him. A balance sheet appended to this commitment `to show that such funds and equipment are available' reflected only Schafitz' personal assets and liabilities. A projected balance sheet filed at this same time contained no amounts reflecting anticipated proceeds from the sale of stock in the corporation to the Journal, Schafitz merely stating at the bottom of this projected balance sheet that, `If additional financing is desirable, the Corporation may sell up to 90 shares of Voting Stock.'"
 
 
 [10]
 Appellants say that such "technical" operating violations are never used as ground for non-renewal of licenses. The Commission responds that where technical violations are compounded by misrepresentations to the Commission concerning the violations the Commission has refused renewal. Leo Joseph Theriot, 32 F.C.C. 599, 22 R.R. 237 (1962). The Examiner's opinion suggests that even in such case the Commission has granted the equivalent of a short term renewal on taking mitigating circumstances into consideration (citing F.C.C. Public Notice released February 6, 1963, Circular No. 31408)
 Insofar as the Commission found mitigating circumstances for Schafitz, it apparently took them into account by granting Schafitz a renewal of license of Station WFAR, Farrell, Pennsylvania — another docket in the consolidated proceeding. There is patently no merit to counsel's contention that this grant is inconsistent with and therefore undercuts the conclusion that the violations were serious enough for a denial of renewal for WWIZ. Lorain. The findings of the Examiner, accepted by the Commission, were favorable concerning Schafitz' operation in Farrell, a community adjacent to Sharon, his life-long residence.
 
 
 [11]
 Pub.L. 86-752, 47 U.S.C. § 503(b)
 
 
 [12]
 In Immaculate Conception Church v. FCC, 116 U.S.App.D.C. 73, 320 F.2d 795, cert. denied, 375 U.S. 904, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963), we held that the Commission need not consider the public service rendered by a station where the license has been guilty of attempts to deceive the Commission. This court affirmed In re Eleven Ten Broadcasting Corp., 32 F.C.C. 706, 22 R.R. 699 (1962), which noted that meritorious program fare while the application is under consideration provides no assurance that the pattern of deception will not be resumed