RETAIL CLERKS INTERNATIONAL
ASSOCIATION, AFL–CIO,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Montgomery Ward & Co., Incorporated,
Intervenor.

MONTGOMERY WARD & CO., Incor-
porated, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Retail Clerks International Association,
AFL–CIO, Intervenor.

Nos. 19682, 19766.

United States Court of Appeals
District of Columbia Circuit.

Argued May 24, 1966.

Decided Jan. 6, 1967.

Mr. Tim L. Bornstein, Washington, D. C., with whom Mr. S. G. Lippman, Washington, D. C., was on the brief, for petitioner in No. 19682 and intervenor in No. 19766.

Mr. Narcisse A. Brown, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Messrs. John W. Noble, Jr., Chicago, Ill., Frederick M. Rowe and Ronald J. Wilson, Washington, D. C., were on the brief, for petitioner in No. 19766 and intervenor in No. 19682.

Mr. Michael N. Sohn, Washington, D. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Warren M. Davison, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before EDGERTON, Senior Circuit Judge, and DANAHER and BURGER, Circuit Judges.

EDGERTON, Senior Circuit Judge.

After extensive hearings before a trial examiner in many localities, the National Labor Relations Board found that Montgomery Ward & Co., Inc. ("the Company") had violated § 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), by inducing employees to file union decertification petitions, laying off and threatening to lay off employees for refusing to answer certain questions, and asking them to produce affidavits they had made; and that the Company had violated § 8(a) (1) and also § 8(a) (5), 29 U.S.C. § 158(a) (5), by polling employees and by refusing to bargain with the Retail Clerks International Association, AFL-CIO ("the Clerks"), at locations where decertification petitions had been filed. The Board ordered the Company to cease and desist from such violations and take certain affirmative action which the Board held was necessary to remedy the effects of the Company's unlawful conduct. The facts are set forth in great detail in the

Board's Decision which accompanies its Order.[1] Both the Company and the Clerks petition for review and the Board cross-petitions for enforcement.

—I—

■ The Board found that the Company had encouraged and assisted its employees to repudiate the Clerks by filing decertification petitions, and that its refusal to bargain with the Clerks at certain locations was a separate violation of the Act. We conclude that the factual findings are supported by substantial evidence on the record as a whole.

■ The Company says its refusal to meet representatives of the Clerks at certain locations was justified by a bona fide doubt as to the Union's majority status there. The Board reasonably found, on the basis of the record as a whole, that the Company's refusals to bargain were "motivated by a central antiunion design" and not by a bona fide doubt concerning majority status. The Company argues that the usual presumption of continuing majority status, absent a bona fide doubt,[2] does not apply where locals of the Clerks merged with other locals of the same union. It cites Dickey v. NLRB, 217 F.2d 652 (6th Cir. 1954). Therefore, the Company says, it cannot be ordered to bargain with the Clerks at these locations, even if the Board's finding of bad faith is sustained, because there is no evidence to support the finding that the Clerks represented a majority of the employees in the bargaining units at these locations.

In *Dickey*, employees "voted to bargain collectively through the Blacksmiths" and the Board certified the results. The Blacksmiths afterwards merged with the Boilermakers, an entirely different union. Pointing out that the employees had "never voted to bargain through a union the majority of whose members did not belong to the Blacksmiths, and whose official representation gives control to another organization than the Blacksmiths," 217 F.2d at 656, the court held that the employer could not be ordered to bargain with the successor union. The present case is very different. The employees voted to bargain through the Clerks and the Board certified their choice. Certain locals of the Clerks merged with other locals of the *same union,* and the Company recognized the merged locals as the bargaining representatives of the employees. We find here no infringement of the employees' right to select their bargaining representatives. The *Dickey* doctrine would not, as the Company contends, defeat the presumption of continuing majority status, notwithstanding the finding of bad faith, and require the Board to conduct an evidentiary inquiry into the "scope, character, structure and purpose" of the successor locals. Cf. NLRB v. Franks Bros. Co., 137 F.2d 989, 992 (1st Cir. 1943), aff'd, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435 (1944); NLRB v. E. A. Laboratories, 188 F.2d 885, 888 (2d Cir.), cert. denied, 342 U.S. 871, 72 S.Ct. 110, 96 L.Ed. 655 (1951).

—II—

■ While the Company was preparing for the unfair labor practice hearings, its attorneys distributed a questionnaire to its employees. Some of the questions[3] dealt with the statements, if any, which employees had made to Board

---

1. Montgomery Ward & Co., Inc., and Retail Clerks Int'l Ass'n, AFL-CIO, 154 N.L.R.B. 1197 (1965).

2. Celanese Corp. of America and Oil Workers Int'l Union, CIO, 95 N.L.R.B. 664, 671–672 (1951). The rule is explored in Hoban v. United Aircraft Corp., 264 F. Supp. 645 (D.Conn.1966).

3. "9. Have you given a written statement or have you been interviewed by a representative of the National Labor Relations Board?

10. If the answer to question 9 is 'yes,' did you sign a statement?

11. If the answer to question 10 is 'yes,' do you have a copy of that statement?" NLRB Decision and Order, *supra* n. 1, 154 N.L.R.B. at 1259 (1965).

investigators. The Company made it clear that it demanded full and frank answers. It suspended employees who balked at answering questions, and threatened some employees with discharge for continuing refusal to answer. The Board ordered the Company to cease and desist from "threatening employees with discharge [or] disciplinary action for * * refusing to answer any questions asked by [its] agents during its investigation * * *." The Board ordered reinstatement with back pay for employees who were laid off for refusal to answer. We think this part of the Board's order is valid.

The "line between proper preparation of a defense in a proceeding of this type and conduct prohibited by the Act is fine indeed." NLRB v. Guild Indus. Mfg. Corp., 321 F.2d 108, 114 (5th Cir. 1963). "[A]n employer may question his employees in preparation for a hearing but is restricted to questions relevant to the charges of unfair labor practice and of sufficient probative value to justify the risk of intimidation which interrogation as to union matters necessarily entails; and * * * even such questions may not be asked where there is purposeful intimidation of employees." Joy Silk Mills v. NLRB, 87 U.S.App.D.C. 360, 371, 185 F.2d 732, 743, cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951).

█ Besides distributing the questionnaire, Company attorneys interviewed employees and asked them to show statements they had given to a Board investigator. Though the record would have supported a finding of coercion that would distinguish such cases as W. T. Grant Co. v. NLRB, 337 F.2d 447, 449 (7th Cir. 1964), the Board held that the mere request was a violation of the Act. The order we are asked to enforce requires the Company to cease and desist from "requesting employees to furnish

it copies of affidavits given by them to Board agents investigating unfair labor practice charges filed against it, interrogating employees regarding the contents of such affidavits. * * *" We think this a valid requirement. Citing our *Joy Silk Mills* decision, *supra*, Judge Bell has said for the Fifth Circuit: "Any interrogation by the employer relating to union matters presents an ever present danger of coercing employees in violation of their § 7 rights. On the other hand, fairness to the employer dictates that he be given a reasonable opportunity to prepare his defense. Accommodation of these interests requires that the scope and manner of permissible questioning be strictly confined to the necessities of trial preparation. We hold that by interrogating its employees as to the contents of statements given to Board agents, and by seeking copies of these statements, the company thereby exceeded these limits and violated § 8(a) (1)."[4]

█ Plainly, interrogation may have a chilling effect on an employee's exercise of his § 7 rights. The limitations the Board imposed on the Company tend to prevent coercion of employees in the exercise of their rights and in the formulation of their testimony. These limitations do not severely handicap the employer's preparation for a hearing, for at the hearing he may demand the statements of employees who testify[5] and may, if circumstances warrant, obtain a continuance to meet surprise testimony.

—III—

In addition to other remedial measures not in issue here, the Board ordered the Company to execute contracts at two different groups of locations.

█ A. The Examiner directed the Company to execute contracts at four specified locations (Punxsatawney, Mt. Vernon, Chico and Du Bois). He found

---

4. Texas Indus., Inc. v. NLRB, 336 F.2d 128, 133 (5th Cir. 1964); *cf.* NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6th Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); Surpre-

nant Mfg. Co. v. NLRB, 341 F.2d 756, 762–763 (6th Cir. 1965); Henry I. Siegel Co. v. NLRB, 328 F.2d 25, 27 (2d Cir. 1964).

5. 29 C.F.R. § 102.118 (1966).

that these locations were included in the bargaining sessions between the Company and the International Union, that final agreement had been reached, that its terms were submitted for employee ratification, and that ratification was voted. Thereafter, as the Examiner found, "nothing remained but the formality of signing the separate agreements." They had not been signed when the Company's decertification campaign resulted in the filing of decertification petitions at these locations, and the Company declined to sign on the ground that it doubted the Clerks' majority status. On review, the Board added a fifth location (Alamosa) where the same considerations were said to apply, and ordered the Company to execute the agreement at all five locations. We conclude that the Board's factual findings are supported by substantial evidence.[6] As a necessary corollary of the Company's statutory duty to execute "a written contract incorporating any agreement reached," 29 U.S. C. § 158(d), the Board has power to direct execution of the contract. H. J. Heinz Co. v. NLRB, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941).[7]

■ B. Before final bargaining sessions between the Company and the International commenced, decertification petitions prompted by the Company's unlawful campaign were filed at twenty-five locations, and the Company announced that it was not bargaining for these locations because it doubted the Clerks' majority status there. The Board found that "but for" the decertification cam-

paign, the employees at these locations would have had the opportunity to ratify the "national agreement" reached at Chicago and submitted for employee ratification at the five locations discussed above. The Board ordered the Company to submit the "national agreement" for employee ratification at these twenty-five locations and, if ratification was voted, "to execute forthwith the national agreement, and institute the benefits of the national agreement retroactive to September 1, 1963." We have concluded that this part of the Board's order cannot be sustained.

Central to this part of the order is a finding that a "national agreement" was reached at Chicago. We could not ascertain all the essential terms of this "national agreement" and asked the parties to submit supplemental memoranda on the subject. The Board's position is now clear. It contends that a "final offer" submitted by the Company in writing shortly before the Chicago negotiations was a "national agreement." The offer contained proposals for contractual terms regarding such matters as vacations, holidays, seniority, union security, and a health, retirement and savings plan. The Company concedes that these proposals are "definite and ascertainable," and all the contracts in the record which were executed as a result of the Chicago negotiations contain these provisions. But concerning wages and hours, the heart of collective bargaining contracts, the "final offer" was silent and the executed contracts in the record which are said to em-

6. The fact that the Examiner had reached a contrary conclusion with respect to the fifth location, while relevant, is not determinative. *E. g.*, Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 131, 351 F. 2d 824, 828 (1965), cert. denied *sub nom.* W. W. I. Z., Inc. v. FCC, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

7. The Company argues that execution of a "side letter" whereby the Clerks would waive initiation fees for long-term employees seeking to join because of a union shop clause in the agreement was a condition precedent to full agreement. The Examiner found that the "side letter" was a very minor matter and that the decertifi-

cation petition, not the side letter, was the reason for the Company's refusal to sign the agreement at the first four locations, and the Board found that the Company refused to sign the agreement at the fifth location "because of the filing of a decertification petition." This was a reasonable conclusion. Mr. Scheidt, the Company's Labor Relations Director, testified that he refused to sign the contracts because of the filing of the petitions. Compare NLRB v. Huttig Sash and Door Co., 362 F.2d 217, 219 (4th Cir. 1966) ; Standard Oil Co. v. NLRB, 322 F.2d 40, 45 (6th Cir. 1963).

body the "national agreement" vary significantly.[8] The Board contends that the Company's "offer" regarding wages and hours was determined on a location-by-location basis from an "area survey" which took into account the practices of other employers engaged in similar businesses. But neither the Board nor the Examiner so found and the scant data in the record to which the Board points are not persuasive that offers were so made. We conclude that the finding that a "national agreement" was reached in Chicago lacks support in the record. Instead, apparently agreements were negotiated on a location-by-location basis, although they included uniform provisions on some matters other than wages and hours.

▇ We need not decide whether the Board's order would be within its broad authority to fashion affirmative remedies to effectuate the policies of the Act[9] if its factual findings were supported. On the record before us we think the Board's order with regard to the twenty-five locations is at odds with § 8(d) of the Act, 29 U.S.C. § 158(d). As the Supreme Court has said: "[Section 8 (d)] contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession. * * * And it is equally clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements."[10] Though the Board may properly order execution of a contract to which the parties have agreed,[11] it may not order execution of a contract to which it thinks they should have agreed.[12] "Of course, if complete accord [has] not been reached * * *, a bargaining order might be eminently appropriate."[13]

We have considered other contentions of the parties but do not stop to discuss them. We think the Board's order is valid except as noted above. The order should be modified to conform with this opinion and will then be enforced.

8. For example, in the contracts before us a sales clerk in the coats and suits department is to be paid $40.00 in one city, $60.00 in another. Similarly, a work week for a man in one location is six days (43½ hours) while it is five days (40 hours) in another location.

9. 29 U.S.C. § 160(c); see Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); H. W. Elson Bottling Co., 155 N.L.R.B. No. 63 at 2–3 (1965).

10. NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952).

11. H. J. Heinz Co. v. NLRB, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941); NLRB v. Huttig Sash and Door Co., 362 F.2d 217 (4th Cir. 1966); Lozano Enterprises v. NLRB, 327 F.2d 814 (9th Cir. 1964); Standard Oil Co. v. NLRB, 322 F.2d 40 (6th Cir. 1963); NLRB v. Nesen, 211 F.2d 559 (9th Cir. 1954), cert. denied 348 U.S. 820, 75 S.Ct. 32, 99 L.Ed. 646 (1955).

12. NLRB v. American Aggregate Co., 335 F.2d 253 (5th Cir. 1964); NLRB v. Cummer-Graham Co., 279 F.2d 757 (5th Cir. 1960); NLRB v. Taormina, 244 F. 2d 197 (5th Cir. 1957); cf. NLRB v. Herman Sausage Co., 275 F.2d 229, rehearing denied, 277 F.2d 793 (5th Cir. 1960).

13. NLRB v. Huttig Sash and Door Co., 362 F.2d 217, 220 (4th Cir. 1966). The Board suggests that we should enforce its order and leave to "supplemental proceedings" the ascertainment of the wages and hours issue. We reject the proposal. Before the Board can require the signing of a contract, it must prove that agreement was reached. See cases cited notes 11 and 12, supra. Reliance on the vague "area survey" standard in a supplemental proceeding does not strike us as an appropriate susbtitute for evidence proving agreement. Indeed, "so inherently speculative a proposition suggests that the Board would have lacked power to 'compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.'" Insurance Workers Int'l Union v. NLRB, 124 U.S.App. D.C. 8, 13, 360 F.2d 823, 827 (1966).