**AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AFL-CIO, KANSAS CITY LOCAL, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Taft Broadcasting Company, Intervenor.

No. 21153.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 19, 1968.

Decided April 18, 1968.

Mr. C. David Whipple, Kansas City, Mo., of the bar of the Supreme Court of Missouri, pro hac vice, by special leave of court, with whom Mr. Samuel Levine, Washington, D. C., was on the brief, for petitioner. Mr. Lewis Ginberg, Washington, D. C., also entered an appearance for petitioner.

Mr. Elliott Moore, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.

Mr. James R. Willard, Kansas City, Mo., for intervenor.

Before BURGER, LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is before the court on the petition of American Federation of Television and Radio Artists (Union) to review an order of the National Labor Relations Board [1] dismissing a complaint against Taft Broadcasting Company (Company). The issue is whether the Board erred in refusing to find, as the complaint charged and the trial examiner held, that the Company violated Sections 8(a) (1) and (5) of the National Labor Relations Act as amended,[2] by unilaterally changing conditions of employment after bargaining for months on proposed contract changes.

1. The Board's decision and order, issued March 20, 1967, are reported at 163 NLRB No. 55.

2. The Act appears at 29 U.S.C. § 151 *et seq.* (1964).

It is settled "that an employer's unilateral change in conditions of employment under negotiation is * * a violation of § 8(a) (5), for it is a circumvention of the duty to negotiate * * *." [3] But the Board held that the present case was governed by this qualifying principle: "[A]fter bargaining to an impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." That is a correct statement of applicable doctrine.[4] The salient question in this case is whether there is substantial evidence to support the Board's finding that the parties had bargained to an impasse. We think there is, and accordingly affirm.

## I

The Board's appraisal of the bargaining situation was different from the Examiner's. The case being a close one on the facts, they are set forth more fully than is customary.

### Background

When Taft Broadcasting acquired ownership of WDAF, Kansas City, Missouri, in 1964, it assumed its predecessor's collective bargaining agreement. In May 1965 it sent the Union a notice of termination effective October 1, 1965, and requested bargaining. The proposal it duly submitted reflected a substantial departure from the existing agreement. The major changes were aimed at giving greater freedom in personnel assignments. The Company wanted complete interchangeability with respect to categories of employees and between broadcasting media without any of the limitations imposed by the existing agreement,[5] which established a structure of fees increasing take-home pay,[6] economic penalties and absolute prohibitions. The Company also wanted to abolish restrictions on pre-recording, which was limited under the contract to only five hours of announcers' services per medium (AM, FM, TV) per broadcast day. The Union's proposal, transmitted September 9, was essentially a carry-over of the old contract, with increases in wages and fringe benefits.

### The Bargaining and Unilateral Changes

The parties met some 27 times in September, October and November. During this period they came to agree on certain matters,[7] but not on the major issues separating them. The Union reported "no progress" in communications sent to its employees October 26, November 5 (when it called for a strike vote), and again on December 1 (99% of the issues outstanding "stem from Company demands for regressive changes").

3. NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962).

4. Dallas Gen. Drivers etc. v. NLRB, 122 U.S.App.D.C. 417, 420, 355 F.2d 842, 845 (1966); NLRB v. Intracoastal Terminal, Inc., 286 F.2d 954, 958 (5th Cir. 1961). *See generally*, Schatzki, The Employer's Unilateral Act—A Per Se Violation— Sometimes, 44 TEXAS L.REV. 470, 495–501, *passim* (1966); Comment, 44 TEXAS L.REV. 769, 773–775 (1966).

5. For example, the existing agreement prescribed specific duties, for a weekly base salary, in different categories—announcer, newscaster, sportscaster, floor manager, and director-coordinator. Generally an employee could perform duties in another category only where permitted by the contract and upon payment of an extra "out-of-category" fee.

Another example: Under the agreement, announcers were designated either "radio" or "television" and could be interchanged only under limited conditions. An announcer could interchange only after 15 minutes and only twice a day. Only three announcers could interchange a day.

6. Apparently the industry is one where fees other than base pay are a substantial part of employees' total compensation.

7. For example, the parties agreed on the issues of preparation time and union shop. The Union agreed to continuation of broadcasting of station editorials by general managers. The Company accepted the Union's proposal for rests between work weeks and withdrew its proposed changes in meal periods.

It was mutually agreed, on September 30, to continue the current contract subject to termination on 15 days notice. On November 19, the Union gave notice of intention to terminate the contract as of December 4. On November 23, the parties agreed to meet henceforth at the office of the Federal Mediation and Conciliation Service. As of November 29, the Union had rejected the Company's proposals on the major issues [8]—both on interchangeability, calling a modification offered in November [9] no more satisfactory than the original proposal, and on prerecording, as to which the Company stated it would be willing to consider prerecording time limits on AM and TV, but not FM. The Company submitted a proposal for a $7.00 increase in weekly base pay. The Union accepted this on condition the old agreement would be continued in all other respects, but the Company rejected that counter proposal.

The parties were split up by the Federal mediators and met in separate sessions with the mediators on November 30. On December 1 the Union advised the employees that the Company was seeking "anti-union weapons we cannot place in the hands of the Company," [10] set up a temporary office structure on the lot next to the station, and ordered picket signs, which were painted December 1–3.

On December 3, the parties met in separate sessions. The Union advised, through the mediator, that it would permit unlimited pre-recording on FM if the Company would "drop off" pre-recording on AM and TV, an offer the Company rejected as permitting a total amount of pre-recording that was less than the contract already provided and hence represented a "deterioration." In the late afternoon the Company asked if the Union was planning to strike the next day, and advised that it would put unilateral changes into effect the next day. The Union spokesman asked if it was the Company's position "that we had bargained to an impasse on all items." The Company's attorney replied "not necessarily." [11]

Saturday, December 4, the last day of the existing contract, the parties met in joint session without discussion of the issues involved in the unilateral changes, though the parties agreed to meet in a subsequent bargaining session. At 4:00 p. m. the Company presented a list of the changes it planned to put into effect at 5:00 o'clock. These included, in addition to the $7.00 pay increase, interchange between media without limitation, use of pre-recording up to 70

---

8. The rejection extended to the issue raised by the Company's desire to eliminate the "double manning" provision requiring a director as well as coordinator for each live program. The Union also rejected a proposal for director-coordinators to be interchangeable with other employees, as no more acceptable than the Company's original proposal (eliminating them from the agreement altogether), which had been undercut by the Regional Director's determination of October 13, that director-coordinators were members of the appropriate unit.

9. Permitting interchange, on payment of in-shift fee, "not to exceed _____ hours per week per artist." The Board agreed that this was "no real change" from the initial proposal. (JA 300, 317.)

10. This apparently referred to the Company's combination of use of pre-recording, elimination of categories, and rejection of Union's proposal to eliminate broadcasting by staff employees the Board had found to be supervisors and removed from the bargaining unit. *Compare* Taft Broadcasting Company, Case No. 17-UC-3 (October 13, 1965) (Regional Director's decision).

11. The Board's decision states: "The attorney replied 'not necessarily' or as he himself subsequently testified 'not necessarily on each and every issue but on the contract'." We are not required to determine whether this should be taken as an intention to resolve the issue of fact in favor of the Company.

The Board's decision states that this came before the pre-recording discussion, but that it came later, and toward the end of the day, appears from the Examiner's finding and the testimony of both Union and Company witnesses.

hours per week on AM and TV and without limit on FM, certain interchangeability sufficient, e. g., to require announcers to do sports for an in-shift fee (rather than out-of-category fee).

The Company's executive vice-president ordered the station to post these changes notwithstanding the protest of the Union's attorney that the parties had not yet bargained to deadlock, and notwithstanding the request of the chief Union representative who said the changes would "infuriate the bargaining unit" and who forecast they would result in a strike. But at the Company's request the Union representative promised to give 24-hour notice in advance of any strike.

Skipping Sunday, the parties met again December 6. On December 7, after the Union representative said he "couldn't buy 70 hours of pre-recording" the Company made offers of 56 and then 50 hours, but the Union was willing to accept this only on condition the Company pay a man as if he were present at the time the material was played. There was discussion of issues without agreement on December 9, and on December 10 the Union said it "had no choice but to give the strike notice." Picketing began December 11. During the next six months the parties met several more times, but did not reach agreement prior to the hearing.

### Examiner's Analysis and Decision

The Examiner's decision and analysis of the case is set forth in the several following paragraphs.

The evidence does not support any contention of bad faith on the part of the Company prior to the unilateral changes. An impasse existed on December 4 as to interchange in categories and media, but there was not an impasse on certain crucial issues; e. g., on the pre-recording issue, viewed separately, there had been proposals and counter-proposals and at the time of the unilateral change the Company had indicated willingness to change its position without indicating in what respect. Thus this was not a case where both parties had adamantly adopted a position and there was nothing further to be said until one or another changed its position.

The Company was seeking major changes to bring the contract in line with its contracts in other parts of the country. The Union resisted stubbornly because the changes would result both in diminution of the unit, as fewer employees would be needed with increased pre-recording and interchange, and in reducing take-home pay. Although there were a number of individual issues which arose "they more appropriately may be viewed as a single issue, i. e., "whether the employer in exchange for the $7 across-the-board wage increase should be permitted freedom to assign its artistic personnel without regard to the categories and media * * * [and with] freedom to pre-record additional material." Both parties appear to have recognized that the various items were interlocking, but each was unable to bring itself, or the other, to bargain on the package as a whole rather than the individual facets. Though the bargaining appeared desultory, there was in fact cautious exploration by both to determine the weak spots of their opponents. To speed up the tempo, each party took steps to "shake up" the other. The Union gave notice of termination of the agreement and engaged in discreet "saber rattling" by suggesting that a strike could result. The Company's unilateral changes were not necessitated by economic considerations, but were imposed for tactical reasons, to get the negotiations off balance. The Union picked the goodies offered by the Company without accepting the package as a whole. The Company increased pressure by further implementing unilateral changes. There was under negotiation, without impasse, both certain particular issues, including pre-recording, and the central issue as defined. The parties were moving, albeit very slowly, and were skirting, but not yet prepared to enter, the realm of impasse.

The Company's change on pre-recording announced December 4 (unlimited FM and 70-hour time limit on AM and TV), did not meet the requirement that unilateral changes instituted shall be no greater than those previously submitted to the Union.

The Company did not satisfy its bargaining duty since it failed to provide adequate opportunity to negotiate concerning the changes between the December 3 announcement and the December 4 posting. On a conflict of testimony credence is given to the Union's negotiator who testified that he had asked on December 3 what the changes were to be. It is "improbable" that, as the Company official testified, the Union did not inquire as to what changes were in contemplation. The Union did not have an adequate opportunity to bargain about the imposition of the changes or about matters not at impasse during the short period between 4 and 5 o'clock on December 4 when they finally had knowledge of the proposed changes, and thus the Company violated the Act by changing working conditions at a time when it had a duty to bargain.[12]

*Board's Decision*

The Board, without hearing oral argument, issued a decision contrary to the Examiner's and found the parties had bargained to an impasse on the single interlocking issue described by the Examiner. Certain issues were resolved, but there is an impasse or deadlock "whether produced by one or a number of significant and unresolved differences in positions." The Board further found that the changes announced on December 4 were reasonably comprehended within the Company's prior proposals. Its order dismissed the complaint.

**II**

In this review proceeding the Union asserts that the Company's unilateral changes in working conditions violated Sections 8(a) (1) and (5) of the Act. It attacks the Board's conclusion that there was an impasse and it argues alternatively that the changes were impermissible with or without impasse.

1. We begin by noting the deference a court gives to a Board finding of impasse. See Dallas General Drivers etc. v. NLRB, 122 U.S.App.D.C. 417, 419–420, 355 F.2d 842, 844–845 (1966):

> [I]n the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.

▮▮▮ This court's function is limited to considering whether in the record as a whole there is to be found substantial evidence supporting the Board's finding of impasse. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We think there is substantial evidence supporting the Board's finding that as of December 4, 1965, there was a deadlock following a lengthy period of good faith bargaining. As the evidentiary facts set out above make clear, minor advances toward agreement were being made all along. But on what the Company considered the critical issue the Union had not budged, and on December 4 it showed no prospect whatever of budging in the future.[13]

12. The Examiner also found that the strike resulted from these unilateral changes and was not an economic strike. He left for future determination any remedial provisions with respect to the strike, inasmuch as the strike was settled subsequent to the hearing, and a contract may have been entered into between the parties. The Company's motion to reopen the record for receipt of evidence relating to the strike settlement was denied by the Examiner. The Board adopted that ruling.

13. It cannot be doubted that a deadlock on one critical issue can create as impassable a situation as an inability to agree on several or all issues. *Cf.* Dallas Gen. Drivers v. NLRB, *supra* (wages); NLRB v. Intracoastal Terminal, Inc., 286 F.2d 954 (5th Cir. 1961) (working schedules and plant closing).

There were a number of evidentiary indicators of impasse, as Part I of this opinion makes clear, to support the Board's finding. One of these was the fact that the parties had been split up by the mediator—a material indicator of impasse, though not conclusive.

■ Our conclusion that the Board's finding must be sustained is not offset even though, as we are prepared to assume, the case was close on the facts and the record also contained evidence substantial enough to support a finding like that of the Examiner. Because the Board reversed the Examiner without hearing oral argument, we have given particular attention to the question whether the Board's findings are vulnerable for failure to reflect attentive consideration of the Examiner's decision.[14]

■ We conclude that the Board's decision is not defective on that ground, and that it reflects that consideration was given to the basis of the Examiner's decision before the Board exercised its permissible discretion to reach a contrary result. Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 351 F.2d 824 (1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). On certain points there was a conflict in testimony where the Examiner's findings must particularly be given weight. We are satisfied, however, that the Board's decision does not rest on a divergent view of credibility of witnesses as to evidentiary facts so much as a different overall judgment as to the proper inferences to be drawn from the largely undisputed evidence concerning the salient ultimate fact. The Examiner also has expertise and experience in this

field. But the statute gives the final say, assuming support in the record, to the collegial conclusion of the Board members, who likewise have particular expertise, and also, presumptively, a judgment enhanced by the perspective of experience in affairs and a breadth of gauge that warranted a Presidential nomination to high office and Senate confirmation.[15]

We cannot agree with the Union's contention, extrapolated from some language in NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962),[16] that the Company could not lawfully institute unilateral changes as long as the parties continued to negotiate.

■ *Katz* is not to be given a too-literal reading that ignores its spirit and reality. It is indeed a fundamental tenet of the act that even parties who seem to be in implacable conflict may, by meeting and discussion, forge first small links and then strong bonds of agreement. But some bargaining may go on even in the presence of deadlock. Here the continued meetings and occasional progress—facts by no means immaterial—were overborne in the Board's view by the conceded impasse on the critical issues of staff assignment on which the progress had been "imperceptible" and, indeed, had led in some aspects, each party claimed, to a widening of the gulf between them. As we see it, the Board's finding of impasse reflects its conclusion that there was no realistic possibility that continuation of discussion at that time would have been fruitful.[17] The Board was justified on the record in concluding that, as of December 4, the prospects of reaching an agreement had

---

14. *Compare* Retail Store Employees etc. v. NLRB, 123 U.S.App.D.C. 360, 360 F. 2d 494 (1965).

15. Oil, Chem. & Atomic Workers etc. v. NLRB, 124 U.S.App.D.C. 113, 362 F.2d 943 (1966).

16. "We hold that an employer's unilateral change in conditions of employment *under negotiation* is * * * a violation

of § 8(a) (5) * * *." [Emphasis supplied by petitioner.]

17. This is a sound standard of deadlock. We do not wish to be understood as approving the language used by the Board at one point (JA 325): "[W]e are unable to conclude that a continuation of bargaining sessions would have culminated in a bargaining agreement." Standing

been exhausted, and the Company had discharged its statutory obligation to conduct full and fair discussions with the Union.

Having concluded that the Board's determination of impasse is supported by the evidence, we need not consider the Company's claim (resisted by both the Board and the Union) that impasse is not required before unilateral changes may be instituted by employers, and that changes by employers (like strikes by employees) are legitimate economic weapons from the bargainers' arsenal *Compare* American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 316–318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); *see* Schatzki, *supra* note 4.

2. The Union has also argued that the changes demonstrate Company bad faith even if there was an impasse when they were made.

■■ *a.* First the Union says that the Company's avowed purpose in making the changes was to circumvent the bargaining representative by an appeal directly to the workers. The Company is reputed to have been motivated by the desire to deal directly with the workers rather than with their representative. The Board sees the matter differently.[18] It acknowledges and agrees with the principle advanced by the Union that an employer cannot, consistently with its duty to bargain in good faith, institute unilateral changes which are designed to "undermine a union's status as bargaining representative." *Compare* Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). But it denies that the Company harbored this intention. On the contrary, it views the Company's purpose as the wholly permissible one of trying to convince

the bargaining agent that the changes would not be detrimental.[19] Ascertaining the motives of the parties, where such an inquiry is relevant, is and ought to be the task of the Board. *See* United Steelworkers of America, AFL–CIO (Roanoke Iron & Bridge Works) v. NLRB, 129 U.S.App.D.C. ——, 390 F.2d 846 (Dec. 27, 1967).

■ *b.* In the alternative the Union argues that the Company's bad faith is established by the circumstances under which the unilateral changes were announced and instituted. Particularly, it is said that the Company failed to give adequate notice of the changes it planned to effect when at 4:00 p. m. on December 4 it handed the Union a draft of the changes it planned to make at 5:00 p. m. that same day. The Board argues that the adequacy of the notice period must be viewed in the whole context of factors relevant to the issue of good faith. We agree. A company that has so exhausted bargaining that it may make a unilateral change is not to be put under a universal requirement of a duty to bargain about timing or other specific aspects of a change that is within the ambit of proposals already made and rejected.

■ 3. Finally, the Union contends that the unilateral changes initiated by the Company covering limits on pre-recording were more favorable to the employees than the offers which the Company had previously extended to the Union at the bargaining table. *See* NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). The Trial Examiner agreed with this assertion but the Board, reviewing the evidence, found that the Company had in fact offered to place some limits on pre-recording in the ne-

---

alone, this language might be taken as indicating that there was a burden to show sessions would have resulted in agreement. But since no objection was made to this finding we will not consider it here. New Castle County Airport Commn. v. CAB, 125 U.S.App.D.C. 268, 371 F.2d 733 (1966).

18. The Board's opinion recounted, with apparent credence, the testimony of management officials denying any attempt to circumvent the Union. J.A. 322.

19. The Union negotiator had made it clear that he felt the employees would be infuriated with the changes. J.A. 44.

gotiation session of November 29.[20] There is no basis for asserting that as a matter of law the particular time limits inserted constituted an element of any realistic significance that either worsened the Union's position or required another session of negotiation because they injected a possible note of solution of impasse.

Since there is substantial record evidence for the Board's conclusion on this and the other issues justifying its decision dismissing the complaint, the petition for review is denied.

So ordered.

20. The Board recounted that the Company furnished the Union a "summary of positions" which read in part: *"Pre-recording:* Union rejects the Company's proposal to drop restrictions. In its summation the Company stated that it would be willing to consider time limits on AM and TV but not on FM."