NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MARTIN A. GLEASON, INC. and
Gutterman Funeral Home, Inc.,
Respondents.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 100, SERVICE EMPLOYEES
INTERNATIONAL UNION,
AFL–CIO, Respondent.

J. N. GARLICK FUNERAL HOMES,
INC., and Martin A. Gleason,
Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD and Local 100 Service Employees International Union, AFL–CIO, Respondents.

Nos. 106–108, Dockets 75–4018,
75–4045 and 75–4047.

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1975.

Decided March 3, 1976.

As Amended May 3, 1976.

Janet C. McCaa, Atty., N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert A. Giannasi, Asst. Gen. Counsel, Washington, D. C., on the brief), for petitioner-respondent N. L. R. B.

Alan D. Gallay, New York City (Fellner & Rovins and Ronald Kreismann, New York City, on the brief), for respondents-petitioners Gleason, Gutterman and Garlick.

Before KAUFMAN, Chief Judge, and ANDERSON and VAN GRAAFEILAND, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

These petitions are from three cases which arose out of the same labor-management dispute, and which, for purposes of review, have been consolidated in this court. In case number 75–4018 the National Labor Relations Board (Board) found that Martin A. Gleason, Inc. (Gleason) and Gutterman Funeral Home, Inc. (Gutterman), New York corporations, had committed violations of §§ 8(a)(1) and 8(a)(3)[1] of the National Labor Relations Act (the Act). Pursuant to § 10(e) of the Act,[2] the Board seeks enforcement of its decision and order issued December 6, 1974, that each respondent cease and desist from its improper conduct; that they make their respective employees whole for any loss of income suffered as a result of the improper conduct; and that they post the usual notices. In case number 75–4045, the Board, pursuant to § 10(e), seeks enforcement of its order of January 21, 1975, approving a settlement stipulation entered into by the General Counsel and Local 100, Service Employees International Union, AFL–CIO. In case number 75–4047, Gleason and J. N. Garlick Funeral Homes (Garlick), the charging parties in the Board's action against Local 100, petition for review of the settlement order.

*Case number 75–4018*

Gleason and Gutterman are both members of the Metropolitan Funeral Directors Association, Inc. which, through its Labor Relations Division, has for a number of years bargained with Local 100 on behalf of those of its members requesting it to do so. The collective bargaining agreement between Local 100 and the Association had expired on October 9, 1973. On October 12th, while negotiations over a new contract were at an impasse, Local 100 called a strike against just three (none of which was Gleason or Gutterman) of the thirty-five members of the Association.

The members represented by the Labor Relations Division, in considering possible

---

1. Section 8(a) of the Act, 29 U.S.C. § 158(a), provides in pertinent part:

 "It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 \* \* \* \* \* \*
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

2. *As amended*, 29 U.S.C. § 151 *et seq.*

united action against this "whipsaw" strike, agreed that they did not want to support[3] the strike against the three establishments, but that each member would decide whether to lock out its unit employees (licensed funeral directors) as a countermeasure. Eighteen members elected to lock out their employees, while fourteen decided not to do so. The strike and lockouts continued until a new collective bargaining agreement was reached approximately two months later.

*Charged violations by Martin A. Gleason, Inc.*

On October 13th, Gleason's president, John Gleason, called three of his four unit employees—Albert Phillips, Robert Gallagher, and Frank Connelly, Sr.[4]—into his office and informed them, by reading from a prepared text, that at the close of business that day all union members (which included all of its licensed funeral directors, as this was a closed shop) would be locked out for the duration of the strike. At that time Gallagher said he did not wish to be out of work and asked Gleason whether there was anything he could do to remain employed at his job.

There was conflicting testimony concerning the reply given by Gleason. Connelly, Sr.'s version was that Gleason said the men were no longer under any obligation to the Union because the contract had expired and, if they resigned, they would be accepted back to work; that they would have to notify the Union of their resignation either by telephone or telegram; that when Connelly asked whether they would be able to rejoin the Union if a contract was subsequently reached, Gleason said the Union would have to readmit them so that at most it would cost them a new initiation fee and they could not be fined or otherwise discriminated against; and that Gleason told

them to think it over and let him know their decision which, in any event, would cause no hard feelings.

According to Gleason, Gallagher and Phillips, however, the substance of Gleason's response was that he could not discuss the matter with them.

Phillips telephoned Gleason on the evening of October 13th and stated that he had decided to resign from the Union. He asked what would happen if he showed Gleason a telegram of resignation, and he was told that he would be permitted to return to work. Phillips reported for work on October 14th and was allowed to remain after he gave Gleason a certification from Western Union that the telegraphic message of resignation had, in fact, been sent to the Union.

Gallagher returned to work on October 15th or 16th and was allowed to remain at his regular job when he presented Gleason with proof that he had resigned from the Union.

Frank Connelly, Jr., telephoned Gleason on October 15th and asked what alternatives there were to being locked out; he was told that the only thing he could do was to resign from the Union. In response to other inquiries by Connelly, Jr., concerning possible alternatives, Gleason told him that if he did not resign from the Union he could not return to work, but he did not at any time specifically ask Connelly, Jr., to resign. Gleason also told him that the new contract would have a "no-recrimination" clause.

Connelly, Sr., said Gleason had stated that employees could return to work only if they resigned from the Union. Neither of the two Connellys resigned from Local 100 nor returned to work until the strike ended.

The Administrative Law Judge (A.L.J.) was of the opinion it was not necessary "to

---

**3.** The three struck establishments employed a total of fourteen employees who were being supported by a union strike assessment of $15. per week per licensed funeral director employed by the non-struck establishments, the collection of which had commenced some time before the strike. Thus, part of the wages

which the non-struck employers were paying to their union employees was going to support the Union's "whipsaw" strike against the three struck employers.

**4.** Gleason's fourth unit employee, Frank Connelly, Jr., was not working that day.

resolve testimonial conflicts between . . witnesses." He concluded that Gleason "conditioned a return to work during the strike upon its employees' resignation from the Union, albeit upon the suggestion of the employees themselves and with the understanding that the employees would rejoin the Union thereafter." He held that Gleason violated both § 8(a)(1) and § 8(a)(3) by "using his control over the employment relationship as the lever for influencing the employee's exercise of his statutory right." He further found that as long as Gleason required its employees to resign from the Union in order to return to work, it was irrelevant "whether the employer expressly and affirmatively solicit[ed] the resignation or merely grasp[ed] the opportunity extended by the employee, who, knowing resignation to be the only possible way of returning to work, himself propose[d] it."

The A.L.J. also held that the conduct of Gleason on February 11, 1974, shortly after the NLRB issued its complaint against Gleason and Gutterman, constituted a violation of § 8(a)(1). On that day, Gleason had called Connelly, Sr., into his office and asked him if he would be willing to obtain for Gleason a copy of the statement Connelly, Sr., had given to the Board. Connelly stated that he had no objection and shortly thereafter wrote a letter to the Regional Director requesting a copy of his statement, adding,

> "I am doing this at the request of my employer. I would like to ask you if this will jeopardize my position in this matter. I don't believe that it will but I want to be sure. If you consider this hazardous please advise me."

The Regional Director provided Connelly, Sr., with a copy of his statement but no advice.

Gleason also asked Phillips, Gallagher, and Connelly, Jr., if they would be willing to let him have copies of the statements they had made to the Board. They each indicated that they had no objection and obtained the copies for him.

The findings and conclusions of the A.L.J. relative to each of Gleason's alleged violations of §§ 8(a)(1) and (3) were adopted by the Board, with certain additional comments on the law.

*Charged violation by Gutterman Funeral Home, Inc.*

At approximately 1:00 a. m. on the morning of October 14th, Gutterman's secretary, Michael Gutterman, called shop steward Frank Marinaro and one August Tolomie, both of whom were strong union adherents, into his office and informed them of Gutterman's decision to lock out its union employees and that "no members of the local [could] continue to work." Marinaro offered to notify the other unit employees and his offer was accepted by Michael Gutterman. None of Gutterman's unit employees resigned from the Union, and none returned to work until after the strike had ended.

Although Gutterman denied that there was any mention by anyone concerning resignation from the Union, Marinaro and Tolomie stated that Gutterman told them that, on advice of counsel, they would have to notify the Union of their resignation, in writing, if they wanted to return to work; that they could rejoin the union after the dispute was settled; and that Marinaro asked if Gutterman would compensate them for any fine imposed by the Union, and Gutterman replied that there would be no fine.

The A.L.J. concluded, and the Board agreed, that the "plain import" of Michael Gutterman's statement, "no members of the local [could] continue to work", was that non-members could work, and, therefore, employees who resigned from the Union would be allowed to return to work.[5] He

---

**5.** Gutterman's counsel argued before the A.L.J. and before this court, that Michael Gutterman's

use of the phrase "members of the local" was equivalent to saying "all licensed funeral di-

also held that "[i]n view of this message, no credibility determinations [were] needed. . . ." The A.L.J. concluded that Gutterman had violated §§ 8(a)(1) and (3) of the Act, and his findings and conclusions were adopted by the Board.

*Discussion:*

Both the Board, as petitioner, and each of the respondent employers have based their arguments in these three cases on the holdings in four Supreme Court cases, *NLRB v. Truck Drivers Union (Buffalo Linen)*, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); *NLRB v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *American Ship Building Co. v. NLRB*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); and *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), as they bear upon the strike, the lockout, the refusal by the employers to give jobs to the locked out employees while they were members of the Union, the resignations of two employees and their return to work for Gleason, Inc. during the lockout.

In *Buffalo Linen* the Supreme Court held that a temporary lockout, conducted by a multiemployer bargaining group, in the absence of specific proof of unlawful motivation, in order to preserve itself against disintegration threatened by a "whipsaw" strike, i. e. a defensive lockout, was lawful. In *Brown* the Court held that employers engaged in a lawful lockout, like that in *Buffalo Linen*, may continue their operations during the lockout by hiring temporary, nonunion, replacement employees, if the employers have a valid, business-purpose justification for doing so. In *American Ship Building* the Court stated that an employer may stage an *offensive* lockout in order to protect his legitimate bargaining position and to exert economic pressure on the union. The Court left unresolved, however, whether during such a lockout, the employer could replace its employees with permanent or temporary help. In both *Brown* and *American Ship Building*, the Court indicated that violations of §§ 8(a)(1) and (3), in such a lockout context, require a showing of unlawful motivation (*i. e.* some element of anti-union animus) on the part of the employer in addition to findings of discrimination and discouragement of union membership.

The matters of unlawful motivation and employer conduct which are "inherently destructive of employee interests," as they interrelate with "business purpose justifications," are analyzed and discussed in *NLRB v. Great Dane Trailers, supra*, 388 U.S. at 32–34, 87 S.Ct. at 1796–1798, 18 L.Ed.2d at 1033–1035. At page 34, 87 S.Ct. at page 1798, 18 L.Ed.2d at page 1035 the Court said,

"From this review of our recent decisions, several principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him."

The issue in the present case is whether an employer who has lawfully locked out its employees can, without violating §§ 8(a)(1)

rectors," since, pursuant to a union security clause, all of Gutterman's licensed funeral directors were members of Local 100. The A.L.J. felt that "[T]he Company's contention that the reference to members is not significant is less than compelling."

and (3), take the position that it will not, during the lockout, allow a striking employee to return to work unless he has resigned from the union, even though the employer at no time asked, or in any way urged, that the union member resign from the union or return to work.

Although the General Counsel took the position that the lockouts were, in themselves, lawful, the Board disagreed and indicated that the General Counsel failed to grasp the broad sweep, significance and effect of what the Board described as the "precise question posed", i. e., ". . . whether employers who are part of a multi-employer bargaining unit may lock out their employees to avoid being whipsawed during contract negotiations and condition their return to work for the duration of the strike upon their resignation from the labor organization representing them in the bargaining," particularly, in the light of the necessity for "balancing of conflicting legitimate interests . . . to effectuate national labor policy."

The Board cited *NLRB v. Brown, supra,* as having authoritative bearing on these cases and recognized that Gleason and the other respondents were free to lock out their union employees and replace them with *nonunion* personnel for the duration of the strike as was done by the respondent employers in that case. It asserted that the feature of the present cases which distinguished them from *Brown,* however, is that Gleason locked out all of its union employees in the bargaining unit (which, as a union closed shop, included all of the employees in the unit) and then, instead of replacing them with temporary nonunion employees, who were strangers to the work force, it conditioned a return to work by any of these locked-out union employees, during the lockout period, upon the employee's permanent or temporary resignation from the Union.

The Board concluded that this pattern of employer behavior harbored great potential damage to the solidarity of the union organization. In *Brown* the employer's continuation of the operation of the business

by the use of temporary nonunion employees was "saved from illegality" by the existence of an "asserted overriding business purpose pursued in good faith," but, in the view of the Board, Gleason's conduct in the circumstances of this case was so damaging that, while it may have been short of being "so inherently destructive of employee interests [that it] could not be saved from illegality by such a business purpose . . .", it served to "undermine any contention that the conduct was 'reasonably adapted' to the effectuation" of an overriding business purpose.

The Board also said that even if Gleason's story that the two employees, Gallagher and Phillips had decided to resign from the Union before they sought to return to work at Gleason, Inc. was true, it would not justify Gleason, Inc. in employing them; "it could not have accepted [the] tender of resignations by the employees [from the union] as the price of return just as it could not have withheld a wage increase until its employees 'volunteered' to forego their support for a union or just as it could not have discharged its employees for joining a union and rehire them when they 'voluntarily' shredded their membership cards."

While the Board found no anti-union animus, the presence of which, according to the decision in *Brown,* would militate against the legality of a lockout, it asserted that it didn't matter whether or not there was any hostile motivation, because the conduct of the respondents was so damaging to union solidarity that it could well be considered as "inherently destructive" and, therefore, incapable of being redeemed as an "overriding business purpose pursued in good faith."

In its brief on appeal the Board said, "Gleason's and Gutterman's reliance on their lack of motive to destroy the Union, evidenced by their long bargaining history and their continued negotiations with the Union after the lockout, is simply misplaced. The Board here did *not* find and does not now rely on any indicia that the employers' *subjective motivation* was illegal. Rather, as set forth above, the

Board found that regardless of their subjective motivation, the employers' conduct constituted an *intolerable encroachment* on important employee rights, an encroachment which could not be excused as 'reasonably adapted' to the pursuit of any legitimate business consideration." (Footnote omitted.) (Emphasis added.)

It also, said,

"In sum, Gleason and Gutterman have here demonstrated, by their lockout and simultaneous conditioning of rehire upon their employees' union resignation, con-

duct *which could well be considered* 'inherently destructive' of vital employee rights. However, even if Gleason's and Gutterman's conduct was not 'inherently destructive' of employee rights, it clearly was significantly destructive of those rights and without any substantial countervailing business consideration." (Emphasis added.)

## Credibility Determinations

In arriving at a decision in the Gleason case the Board approved the A.L.J.'s conclusion that it was unnecessary[6] "to resolve

---

**6.** The Board's brief on appeal discussed the *Great Dane* decision and stated that ". . . the Court articulated two categories of employer conduct which violate Sections 8(a)(1) and (3) of the Act without regard to anti-union animus." The first category covers employer's conduct which is described as "inherently destructive" of important employee rights and is an unfair labor practice "even if the employer introduces evidence that the conduct was motivated by business considerations." The Board also noted that the Supreme Court declared that such conduct bears its own indicia of intent and may be proscribed even in the absence of specific evidence of antiunion motivation. It is these attributes of the first category which the Board was desirous of invoking, thereby being relieved of countering any evidence of the employer relative to a lack of antiunion motivation or the motivation of its conduct by business consideration.

The Board's brief also mentions the second category established by the Supreme Court in which the employer's conduct "has only 'a comparatively slight' impact on the rights of employees" but which will also be deemed an unfair labor practice unless the employer introduced evidence of "legitimate and substantial business justification for the conduct." If the employer can demonstrate substantial reasons to justify his conduct, then the Board has the task of striking "the proper balance between asserted business justifications and the invasion of employees' rights in light of the Act and its policies."

In its opinion the Board, in effect, implied that the behavior of the employers was "inherently destructive of important employee rights." It did not, however, expressly so state. In fact, on each of the several occasions thereafter in which the characterization was used, the Board pulled back from a definite holding that the employers' conduct was inherently destructive. It did, however, commandeer the use of the ancillary feature of the first category or classification which eliminated the necessity for any proof of antiunion motivation and the consequences of a showing by an employer

that his conduct was motivated by business considerations. At the points where the Board found that Gleason had "conditioned a return to work during the strike upon its employees' resignation from the union" and where Gutterman was found, from an interpretation of his statements, to have advised its employees that "if non-members could work, resignation was the remedy," the Board, in effect, invoked the rule attendant upon the conclusion that the employers' conduct was "inherently destructive" by declaring that it was unnecessary to make any credibility determinations to resolve testimonial conflicts between witnesses. Several times thereafter oblique mention was made of this term, but always in a way which fell short of a definite conclusion that Gleason and Gutterman's conduct was "inherently destructive."

Instead of following the "analytical framework" of *Great Dane* and pursuing the employers within it and in accordance with the procedures proscribed for the second category, the Board created, *sua sponte*, a middle category of "intolerable encroachment" on important employee rights, which it endowed with the characteristics of presumption of anti-union animus or motivation and the further presumption of the absence of any possible legitimate business consideration.

These presumptions, of course, made unnecessary the pursuit of the procedures delineated and the standards of proof required within the second category. We are deciding, *infra*, that the lockout was lawful, and it was not ordered for the purpose and intention of putting the employees out of work in order to get as many of them as possible to resign from the union. Cf. *NLRB v. Clearfield Cheese Co.*, 213 F.2d 70, 73 (3 Cir. 1954). In dealing, therefore, with the remaining issues in the case, it must be done in the context of a lawful lockout. With the charge of unlawful lockout eliminated, the remaining factual issues more closely parallel those in *Great Dane* which was classified in the second category of unfair labor practice seriousness.

testimonial conflicts between . . . witnesses." We are satisfied, however, that such a resolution is necessary. *NLRB v. Great Dane Trailers, supra.* The case must, therefore, be remanded for a determination of the credibility of the witnesses and the weight to be given their testimony, together with a recital of the bases on which the determinations rest. This will also require such amended findings as are necessary to reflect them.

The determination should cover all testimony which is a part of the record of the case and which, therefore, has already been given by the officers and employees of Gleason, representatives of Union Local 100 and others, relating to the lockout ordered by Gleason, the applications by locked-out employees of Gleason to return to their jobs during the period of the lockout, and any testimony dealing with the terms and conditions of such a return to work during the lockout period, including statements, conversations or discussion concerning resignations by the employees from the Union.

In the foregoing discussions there have perhaps been more frequent and more specific references to the Respondent Gleason, Inc. than to the Respondent Gutterman Funeral Home, Inc., nevertheless, the rulings and statements by the A.L.J. and the Board and their comments on the issues in the cases generally relate to both cases, and so does the discussion by the court, unless the applicability of the subject matter is separately specified.

Once the A.L.J. had concluded that Gutterman at the time of the lockout had subtly advised its employees to resign from the Union after which they would be allowed to return to their old work, while the strike and the lockout were still in force, he held, as he did in Gleason, that "in view of this message, no credibility determinations [were] needed . . ." and that Gutterman had violated § 8(a)(1) and (3) of the Act. Actually, none of Gutterman's employees ever did resign.

There was conflicting testimony as to what was said and by whom at the meeting in the office of the secretary, Michael Gutterman, at 1:00 a. m., October 14, 1973 between the secretary and the employees, shop steward Frank Marinaro and August Tolomie. As the record now stands the Board reached the conclusion that employees were told by Gutterman that any of them who resigned from the Union would be allowed to return to work for the duration of the strike and lockout, from Michael Gutterman's bare statement, "no members of the local can continue to work . . ."

From this statement the Board arrived at its ultimate conclusion in two steps. From the statement itself it drew the inference that it meant that "non-members of the union can work there during the period." Then from this first sentence the Board drew another inference which was that Gutterman was really saying to the employees, "Resign from the union, and you can return to work."

■ In the fact finding process a trier is authorized to draw reasonable inferences from known or proven facts. But the inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and is not one of two or more inferences, both or all of which are about equally probable.

■ The ultimate inference drawn here and accepted as a cornerstone fact by the Board, in support of its theory of the case, was that Gutterman said to his employees, as he locked them out, "Resign from the union, and you can return to work." Under the circumstances, these inferences were not reasonably drawn but were arbitrary and capricious. The natural, logical and reasonable inference to be drawn from Michael Gutterman's statement "no members of the local can continue to work" (the version found by the Board) was that he was simply telling the employees that they were locked out. Michael Gutterman's entire statement in his testimony was, "I told them that no members of the local can continue to work *and not to report to work.*" (Emphasis added.)

■ We are, of course, fully aware that the right to draw inferences is generally within the domain of the trier, *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996, 1005 (2 Cir. 1973), but the power is not absolute. As the findings and conclusions reached by the Board in the Gutterman case rest on improperly drawn inferences, they must be set aside, and the case must be remanded for a determination of the credibility of the witnesses who were at that meeting and the weight to be given the testimony of each, together with a discussion of the bases upon which the determinations rest. This will also require such amended findings as are necessary to reflect them.

The findings, conclusions and rulings of the Board in its order, appear to declare *the lockout unlawful* in its purposes and objectives. We are of the opinion that on the present record, as a whole, in this case, the conclusions are not adequately supported, nor are they consistent with the applicable law. The lockout by Gleason, Gutterman and other employers was a legitimate response in defense of their interest in preserving group bargaining by the multiemployer association which was the target of the Union's whipsaw strike tactics. *Buffalo Linen, supra; Brown, supra.*

The Board has held, in effect, that the purpose of the lockout was not in response to the Union's whipsaw strike tactics but was done with the object of putting the employees out of work and compelling them to resign from the Union before getting their jobs back. The present evidence does not support any such conclusion. In its brief the Board stated that "it did not find and does not now rely on any indicia that the employers' subjective motivation was illegal." The strike had continued and the bargaining continued. The subject of providing jobs for any of the locked-out employees did not arise until *after* the lockout was announced, and it was then brought up by the employees, as the Board found, and not by the employers. The General Counsel did not attack the legality of the lockout in and of itself. Moreover, there is no affirm-

ative evidence to show that the object of the lockout was to destroy the union by compelling the members to resign from the union before returning to work. See *American Ship Building Co. v. NLRB, supra.* At the respective times at which Gleason and Gutterman issued their orders for temporary lockouts, their sole motivation was to interpose a defense against the union's whipsaw strike which threatened the destruction of their multiemployer bargaining association. It was completely within the authority and the holding in *Buffalo Linen, supra.* We hold, therefore, that the lockout was lawful.

We now turn to the Board's claim that the lockout was used for an unlawful purpose in that Gleason and Gutterman allegedly refused to permit the former employees to return to work unless they first resigned from the Union. The Board declared this an unfair labor practice, in violation of §§ 8(a)(1) and (3) of the Act and so ruled.

■ As the cases are being remanded for credibility determinations with respect to evidence already in the record concerning what the employers said to their former employees about the post-lockout situation, when and on what terms and conditions the employees might return to work during the lockout; what would be the situation of the employees after a new contract had been entered into and the bargaining, the strike and the lockout had all terminated, a complete and definitive finding cannot be placed in the record on this claim by the Board and therefore it is not in a posture to be decided by this court.

It must be emphasized that the case is not remanded for the purpose of any rehearing or the taking of any additional testimony. Jurisdiction is retained in this court. The credibility determinations may result in some changes in the present findings, but this should not prevent our discussion of the bearing which the Supreme Court's decisions in *Buffalo Linen, Brown, American Ship Building,* and *Great Dane Trailers,* have on the present case, in which

the outlines of the issues are already reasonably clear.

The claim of the Union, with which the Board substantially agreed, is that the employers, in postures of ordering a lawful lockout, turned all of its licensed funeral directors out on the street and then told them that if they wanted to return to their jobs, they would first be required to resign from the union, to which they all belonged. The charge in the complaint was that this conduct by the employers "interfered with, restrained and coerced the employees in the exercise of their § 7 rights and constituted an unfair labor practice under §§ 8(a)(1) and (3)."

■ The Board concedes that the question of the locked-out employees returning to their jobs, was advanced by the employees themselves and not by the employers, and also that it was the employees who suggested to Gleason that each employee, returning to work, would first resign from the union with the intention of rejoining it after the lockout was over. Of course, under § 7, 61 Stat. 140, 29 U.S.C. § 157(b),[7] a union employee has a right to resign from the union, although the union constitution and bylaws may impose sanctions and limitations on this right, 61 Stat. 141, 29 U.S.C. § 158(b). See *Booster Lodge # 405 v. NLRB*, 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1973); *NLRB v. Granite State Joint Board, Textile Workers*, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972). The Supreme Court has left open the question of the extent "to which contractual restriction on a member's right to resign may be limited by the Act." But the right to resign cannot be completely destroyed. The Board brushed aside this point by simply stating that the employee's right to resign from the Union does not "enable an employer to induce or encourage defection from a union, still less by conditioning job eligibility on withdrawal from the union." No one has claimed that it does. The employee's right to resign is one thing, and the employer's right to say that he can only employ nonunion help is another, and each must be separately considered.

■ In formulating responses to the inquiries by the employees about returning to work after the lockout had been ordered, the employers had a number of things to consider and they certainly had a right to discuss them with the locked-out employees, § 8(c), NLRA (as amended) (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.). They could mention that the employees could not return to their jobs as members of the striking union against whose whipsaw strike the lockout was invoked as a defense, because that was the natural result of a lawful lockout; that in accordance with the decision in the *Brown* case, the employers could only use temporary, nonunion employees to keep the business going during the lockout and that it was only in the event that its locked-out union employees became nonunion members of the labor market that Gleason could temporarily take them back for the duration of the lockout.

These circumstances were simply the result of the lockout and the pressing need of some of the locked-out employees of Gleason immediately to return to gainful employment.

Assuming that the employers confined themselves to utterances such as these, they would be well within their rights. The statements were only a recitation of existing facts in the light of the applicable law; and they could be freely stated by the employer in the absence of any solicitation of union members to accept nonunion employment or encouragement of workers by the employer to resign from the union. In oth-

---

**7.** Section 7 of the Act, 29 U.S.C. § 157, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

er words a decision by an employee to resign from the union and to seek employment must be made independently by the employee and entirely on his own. He may hope to get a job with his old employer but he must be given no assurance that he can have one, if he resigns from the union; nor can the employer give him any inducement to do so. The employer, however, has no duty to declare that it would not employ the former union-member employee at all. Moreover, the employer cannot be faulted if the employees draw an inference from the employer's statement that it can hire non-union labor during the lockout, that a job may be available there for him. The Board is of the opinion that remarks of this kind by the employer to the employees under the circumstances, even though carefully circumscribed as above stated, constituted an unfair labor practice, and to prevent it, the employer should be prohibited from giving any former employees who had resigned from the union, such temporary employment. With this position we must disagree.

We have just described the outer bounds of what an employer can say, without risking an unfair labor practice. This is where the line must be drawn. No employer can ask its union employee to resign, or promise him another job if he resigns from the union, or urge, induce, recommend, encourage, persuade or compel him to do so.

The Board must now make findings and decide, on remand, whether or not Gleason and Gutterman remained within these permissible bounds.

From the examination of the record, a view of the circumstances immediately following the lockout emerges. The employers and the union employees obviously both faced certain problems. The employees no longer received wages; and the employers were making an effort to continue their businesses with nonunion substitutes for their skilled, experienced and *licensed* undertakers. Prompted by the suggestions of one or two employees, Gleason, after making some effort to avoid mentioning any inducement to union employees to resign temporarily from the union, fell into discussing the revival of an arrangement the employers and employees had adopted at the time of the bargaining and strike three years before, and that was, that the employees would resign from the union, return to work as nonunion employees of Gleason for the period of the strike and lockout. It was further understood that the employees would apply to rejoin the union at the end of that time and that Gleason would see to it that any new contract would provide that there would be no recriminations or sanctions against the employees for their resignations. Gutterman made it clear that he would cooperate in following the same revolving-door procedure. None of its employees resigned. Of Gleason's four employees, two resigned. In the 18 establishments in the lockout, there were apparently seventy-odd licensed funeral director union employees but the two from Gleason's were the only ones who resigned from the Union. The strike and lockout terminated on December 12, 1973, with the end of the bargaining and the making of a new contract. All of the employees, including the two who resigned, returned to the Union and to work.

In several places in his opinion, adopted by the Board, the A.L.J. cites and discusses *NLRB v. Brown, supra,* as closely related to the present case and there is no doubt that *Brown* has a great deal of bearing on it. The approval of the use of the lockout in multiemployer cases where the employers seek to defend against whipsaw strikes against two or three of their members was indicated in *Buffalo Linen.* Although this gave some added strength to the employers, those who were not struck but who ordered a lockout to assist their beleaguered associates, were often at a disadvantage because the struck employers continued to operate their businesses by using help not connected with the striking union. This situation was sought to be alleviated by the Supreme Court's decision in *Brown,* which held that the employers, who had locked out their employees, could continue to operate their businesses by hiring temporary nonunion help for the period of the strike and lockout. In the present case we have held that

the lockout was lawful under the authority of *Buffalo Linen* and *Brown*, and there is now before us the question whether two employers out of 35 who decided to keep their businesses in operation by the use of their union-member locked-out employees, with the understanding that these employees would resign from the union and return to work for the temporary period of the strike and lockout with the intention that, at that time, they would seek to rejoin the union and return as union-member, permanent employees of the employer, and with the further understanding that the employer would insist on a no recrimination clause provision in the new contract, then being bargained for with the union, in order that these employees would be able to rejoin the union without being subject to fine or sanctions by the union, violated §§ 8(a)(1) and (3). It is our opinion that there is nothing in the decision in *Brown* which gives approval for such a revolving-door means of providing continuous employment for otherwise locked-out union-member employees. The Court in *Brown* specifically described the employees which the employer could lawfully use for the period of the strike and lockout as "temporary nonunion employees" which plainly excluded regular union member employees. There were actually only two employees involved. None of Gutterman's employees resigned from the Union. Gleason's two employees, Gallagher and Phillips, were, technically speaking, resigned from the Union and were no longer regular employees of Gleason. But, if it is found that, while they may have taken some risk in resigning from the Union, they never intended to resign more than temporarily, but to go back to the Union at the end of the lockout; and, though they resigned as regular employees from Gleason, they only intended to remain temporary employees during the same period and to return to their regular positions thereafter, then Gallagher and Phillips may have been considered as potential sources of disagreement and discord as lockout breakers and receivers of discriminatory wages while their fellow members of the Union were either out on the strike against the struck

funeral homes or were out on the street as locked-out union members of the 13 other associated companies, in addition to which Gallagher and Phillips may have sidestepped the necessity of making contributions to support the strike. It might further be considered whether in this strike-lockout environment, the employment arrangement, pursued by the employers and the resigned employees, provided an additional thorny issue to be tossed onto the bargaining table which was already, apparently, in an impasse.

Proceeding on the basis of this court's holding that the lockout was in all respects lawful, none of these possible elements of what may have been an unfair labor practice can be found to be a violation by Gleason or Gutterman if it is concluded that they did not *induce* the resignations from the Union by any of their employees.

In remanding the §§ 8(a)(1) and (3) portions of this case to the Board for credibility determinations, we are of the opinion that much obscurity and confusion will be avoided and clarification gained, if the teachings of *Buffalo Linen, Brown, NLRB v. Fleetwood Trailer Co., Inc.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), and other relevant cases, are applied to the amended findings and conclusions in these cases through the "analytical framework" of *Great Dane Trailers,* which was particularly designed, as the Board said, "to test the lawfulness of employer conduct."

*Backpay*

 Because we hold that the lockout itself was lawful, enforcement of that portion of the Board's order which requires Gleason and Gutterman to provide backpay to their employees is denied. The remedy of backpay is "a reparation . . . designed to vindicate the public policy of the statute by making the employees whole for losses suffered *on account of* an unfair labor practice." (Emphasis added.) *NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405, 410 (1969); *Nathanson v. NLRB,* 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23, 28 (1952).

Its purpose is to reimburse employees for actual losses of wages caused by an unfair labor practice, and to deter further violations of the statute. *NLRB v. Mastro Plastics Corp.,* 354 F.2d 170, 175 (2 Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); *NLRB v. Local No. 2, United Ass'n of J. & A. of P. & P. I.,* 360 F.2d 428, 434 (2 Cir. 1966). *Back* pay rests on the employees' right to have had work, and should not be awarded to compensate for lost wages which they could not have earned in any event. *NLRB v. Local No. 2, supra.* Here, the employees' loss of earnings was caused by the lawful lockout, and not by any subsequent wrongful conduct by the employers. A backpay order, therefore, is not justified in this case.

*Gleason's request for employees' statements*

We turn next to the issue of whether Gleason's requests to its employees for copies of the statements they had given to a Board agent during the latter's investigation of the unfair labor practices allegedly committed by Gleason, violated § 8(a)(1).

As the cases hereinafter cited disclose, the Board has for some time pressed for a *per se* rule prohibiting any request by an employer for copies of statements or other communication of information given by an employee to the Board in connection with the General Counsel's investigation and prosecution of an unfair labor practice charge. While most United States Courts of Appeals have been generous in supporting denials of requests for such prehearing statements for a wide variety of specific reasons, e.g. fear, coercion, a fishing expedition by the employer, no valid interest in employer to make the inquiry, and similar factors which militate against the probability that the employees' response to the request can be completely free and voluntary and without impairment of his § 7 rights, this circuit has never adopted the *per se* rule and has never even implied that "the mere request for a prehearing statement constituted a violation" of § 8(a)(1). When the court has granted a Board order holding that a request for statements violated the

Act, there has been present one of the above mentioned factors.

As this court stated in *Henry L. Siegel Co. v. NLRB,* 328 F.2d 25, 27 (2 Cir. 1964), "The question is whether the Employer's conduct interfered with the exercise of rights guaranteed to the employees by section 7 of the Act." In that case "[s]everal employees testified to their apprehension when requested to deliver copies of their statements, to the extent that some of them were induced to destroy their copies . . . ." The court found, therefore, that there was substantial evidence "on the record considered as a whole to sustain the Board's conclusion that the Employer's requests did have an inhibitory effect on the employees' exercise of their right to have an effective investigation by the Board of alleged unfair labor practices."

When the Board asked this court to hold in *NLRB v. General Stencils, Inc.,* 438 F.2d 894, 898 (2 Cir. 1971), that the employer's interrogation of the employee Kretschmer, as to what he, Kretschmer, told the Board agent, fell within the ban of our decision in *Henry L. Siegel Co. v. NLRB, supra,* and of the Sixth Circuit's decisions in *NLRB v. Winn-Dixie Stores, Inc.,* 341 F.2d 750 (6 Cir.) cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965), and *Surprenant Mfg. Co. v. NLRB,* 341 F.2d 756 (6 Cir. 1965), we held that, unlike the employees in *Henry L. Siegel Co.,* the testimony did not suggest that this particular employee felt himself "subject to coercion—indeed, he apparently had no qualms in indicating . . . that he told the Board 'the truth.'" This court went on to say:

"We thus might have hesitated in sustaining the Board's finding on this issue were it not that we perceive[d] no legitimate employer interest in the solicitation of such information under the circumstances here presented and an order condemning such questioning without proof of effect [was] thus justified."

The question of "whether this would be true if the employer could demonstrate that he was only and in good faith seeking information with which to prepare for hearing

on alleged unfair labor practices" was expressly reserved. 438 F.2d at 898, n. 3.

After carefully analyzing the prior cases in this area, the Fourth Circuit in the excellent opinion by Judge Boreman in *Robertshaw Controls Co., Lux Time Division v. NLRB*, 483 F.2d 762, 767–69 (4 Cir. 1973), stated:

"The Board adopted the *per se* rule on the theory that a pretrial statement of an employee may well contain information not material to the proceedings brought against an employer, and to which, therefore, he is not entitled. It is argued that if these statements must be made available to the employer simply at his request the ability of the Board to investigate allegations of unfair labor practices would be seriously hampered due to the inhibitory effect on the employees' willingness to talk. . . . While this argument may have merit in many situations, such as when an employer goes on a 'fishing expedition' for any statements given by his employees in the course of a general investigation we cannot agree that the mere request for copies constitutes a Section 8(a)(1) violation under the facts of this case.

There is no evidence that the five employees were coerced when the requests were made for copies of their statements. . . ." 483 F.2d at 769.

In the present case, the Board found that Gleason's requests for copies of his employees' statements violated § 8(a)(1), '[n]otwithstanding the voluntary character of Gleason's requests for the copies of the employees' statements and the willingness of the latters' compliance therewith. . ." Gleason asked each of the four employees "if they would mind" supplying copies of their statements; "[h]e indicated he was not requiring them to do so." Three of the employees testified that they had had no objection, and therefore willingly complied with the request. The fourth employee, Connelly, Sr., told Gleason he had no objection, and when he obtained the copy from the Regional Director he specifically asked

the Board to advise him if he should for any reason refuse to give it to Gleason. The Board knew that each of the employees was seeking a copy of his own statement on behalf of Gleason. It, therefore, had here, as well as it did in *Robertshaw*, the opportunity to "determine the voluntariness of the employees' participation, to excise portions considered irrelevant or immaterial or refuse to comply with the request." *Robertshaw Controls Co., Lux Time Division v. NLRB, supra*, at 770.

The Board argues that *Robertshaw Controls Company* is not applicable to the present case because,

"There the court carefully distinguished a long line of Board and court cases supporting our position herein, pointing out that in *Robertshaw* the request for statements was in the context of very minor unfair practices, involving a small number of employees, and that there was no wholesale investigation by the Board of antiunion activities on the part of the company. The court concluded that the request in that case did not violate Section 8(a)(1) because of its 'particular and somewhat unusual facts.' The instant case squarely meets the court's criteria for finding that, in cases, as here, where extensive unfair labor practices are alleged, an employer's request that its employees provide it with copies of statements given to the Board violates Section 8(a)(1)."

In so stating the Board completely ignored the statement by the Fourth Circuit that,

"The Board cites a number of cases to sustain its argument that the mere request for pretrial statements violates the Act. An examination reveals particular features of those cases that render them of little or no value in support of the Board's argument."

We agree. We are of the opinion that the majority of the Board erred in its reading and application of *Robertshaw* because, as Judge Boreman pointed out, only one of the opinions [8] cited in that case which the Board mentioned as supporting its conclusions in

---

8. We decline to follow the holding in *Retail Clerks International Association v. NLRB*, 125 U.S.App.D.C. 389, 373 F.2d 655 (1967), on this

issue for the reasons set forth in *Robertshaw Controls Co., Lux Time Division v. NLRB*, 483 F.2d 762, 768–69 (4 Cir. 1973).

the present case, rested on the mere request for a statement. Furthermore, contrary to the Board's assertion, the propriety of the request for a copy of an employee's statement does not turn solely on the size of the investigation or the scope of the offense but on the voluntary nature of the compliance and the employer's need for the information.

■ If the facts in *Robertshaw* were "particular and somewhat unusual," they appear to be fairly similar here. There were in the present case only four employees solicited; there was nothing remotely to indicate any unwillingness or even hesitancy to comply, save Connelly, Sr., who wrote the Regional Director for advice in the premises, which the Director didn't think important enough to answer when he sent the statement for Connelly, Sr. to give to Gleason. Moreover, the Regional Director who had drafted the complaint was the one who handed over the statements, after having had ample opportunity to examine into the voluntary nature of the agreed compliance and to excise any portions of the statements which he considered irrelevant or immaterial to Gleason's defense. Like the five employees in *Robertshaw*, both Gallagher and Phillips in the present case were employer's witnesses, as often happens when some employees are at odds with their union. The *per se* rule would prohibit an employer's inquiry of such employees, to the prejudice of both.

As noted, the Board concedes, and properly so, that Gleason made compliance voluntary with his employees, and that the employees were willing to comply. We have not in this circuit adopted the *per se* rule requested and decline to do so; and there is insufficient evidence to support the Board's decision that the circumstances surrounding the request constituted coercive interrogation. See *Bourne v. NLRB*, 332 F.2d 47, 48 (2 Cir. 1964); *NLRB v. Scoler's Incorporated*, 466 F.2d 1289 (2 Cir. 1972).

Neither *NLRB v. Interboro Contractors, Inc.*, 432 F.2d 854, 857 (2 Cir. 1970), nor *NLRB v. Lizdale Knitting Mills, Inc.*, 523 F.2d 978 (2 Cir. 1975), is applicable to this issue. In both of those cases the court held only that parties in a proceeding before the Board and its examiner are not entitled to the full panoply of discovery procedures provided by the Federal Rules of Civil Procedure as a matter of statutory or constitutional right but that the taking of affidavits or depositions for the limited purpose of obtaining and preserving evidence for trial (but not for discovery and disclosure) was left to the discretion of the administrative law judge, in order to provide safeguards designed to forestall such intimidation and harassment as would otherwise be possible because of the leverage inherent in the employer-employee relationship. It is not a violation of § 8(a)(1) to request such limited discovery and disclosure and these cases do not stand for such a proposition. Furthermore, if the appealing party demonstrates that he will be clearly prejudiced if he is denied access to the information requested, the general counsel will have abused his discretion if he does not grant discovery.

We hold that, on the record as a whole, the facts are insufficient to sustain the Board's conclusions and order which decided that the requests, not threatening in themselves, made by Martin A. Gleason, Inc. to its employees to provide it with copies of statements given by them to a Board agent, constituted an unfair labor practice in violation of § 8(a)(1) of the Act, though at the time of the requests the employer was preparing for trial on an unfair labor charge and the requests were for information relevant to the issues and were likely to provide evidence necessary for his defense. See *NLRB v. National Survey Service, Inc.*, 361 F.2d 199, 206 (7 Cir. 1966).

The petition for enforcement of the order is denied.

*Cases 75–4045 and 75–4047*

On March 13, 1974, Gleason and Garlick filed unfair labor practice charges, arising

out of the strike, against Local 100. On July 24, 1974, the Board's Regional Director issued a complaint against Local 100, alleging that the Union had violated § 8(b)(1)(A) of the Act[9] by telling union members that it would not accept resignations, and that members who sought to resign or return to work, or who refused to do picket line duty during the strike, would be fined or otherwise penalized by the Union. On August 26, 1974, General Counsel and the Local entered into a formal settlement stipulation (subject to Board approval) which provided that the Union would cease and desist from actions such as those alleged in the complaint; would post appropriate notices; and would waive all further proceedings before the Board and defenses before the Court of Appeals. The stipulation also contained a "non-admission" clause, that is, it provided that the Union, by signing the stipulation did not admit to the alleged violations. Further, the stipulation did not require that the Union provide backpay to affected union members.

A hearing was held before an Administrative Law Judge, at which General Counsel appeared in support of the settlement and the charging parties, Gleason and Garlick, appeared in opposition. The A.L.J., by decision of October 31, 1974, granted General Counsel's motion for its approval. The charging parties carried their objections to the settlement to the Board, but the Board decided that the settlement fully remedied the allegations of the complaint, and that approval of the settlement "would effectuate the policies of the Act."

■ Gleason and Garlick object to the settlement because of the inclusion of the non-admission clause, and the lack of a backpay order. Citing the seriousness to the employees of the § 8(b)(1)(A) violations

alleged in the complaint and the importance of the rights which the Union allegedly infringed,[10] Gleason and Garlick argue that it was entirely inappropriate for the Board to settle the complaint without so much as requiring the Union to admit its guilt, or to make whole those union members who lost wages because they were coerced by the Union to refrain from returning to work during the strike.

■ The NLRB, however, has broad discretion to determine when settlement of a complaint, rather than continued litigation, will "best effectuate the purposes of the Act"; and to select the appropriate remedy for an unfair labor practice. This court recently explicitly reaffirmed both of these points. *Containair Systems Corp. v. NLRB*, 521 F.2d 1166 (2 Cir. 1975). See also *NLRB v. Gissell Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547, 577; *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233, 241 (1964); *Lodges 743 and 1746, I.A.M. v. United Aircraft Corp.*, 534 F.2d 422, p. 465 (2 Cir. Sept. 9, 1975); *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996, 1006 (2 Cir. 1973); *Lipman Motors, Inc. v. NLRB*, 451 F.2d 823, 829 (2 Cir. 1971); *Herald Company v. NLRB*, 444 F.2d 430, 435–37 (2 Cir.), *cert. denied*, 404 U.S. 990, 92 S.Ct. 532, 30 L.Ed.2d 541 (1971); *Local 282, I.B.T. v. NLRB*, 339 F.2d 795, 797 (2 Cir. 1964). In *Containair Systems Corp. v. NLRB, supra*, a settlement stipulation, which contained a non-admission clause, was enforced, over charging parties' objections. Other cases have approved settlements which omitted backpay orders. See, *e.g.*, *Lipman Motors Co. v. NLRB, supra; Local 282, I.B.T. v. NLRB, supra; NLRB v. Oil Chemical Atomic Workers Union*, 476 F.2d 1031 (1 Cir. 1973).

---

9. Section 8(b) of the Act, 29 U.S.C. § 158(b), provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title . . . ."

10. Gleason and Garlick cite *Booster Lodge No. 405 v. NLRB*, 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1973), and *NLRB v. Granite State Joint Board*, 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1972). As we note elsewhere, the Supreme Court in those cases emphasized that employees have the right, under § 7 of the Act, to resign from their union and thereafter to refrain from participating in its strikes.

The bases for the petitions of Gleason and Garlick are not sufficiently compelling, to warrant an interference with the Board's exercise of its broad discretion to settle cases and determine appropriate remedies. Accordingly, enforcement of the Board's order approving the settlement is granted and the petitions of Gleason and Garlick for review are denied.

IRVING R. KAUFMAN, Chief Judge (concurring and dissenting):

I concur in Judge Anderson's opinion with the exception of that portion holding that Gleason's request for his employees' statements to the Board did not violate § 8(a)(1).

In *Henry L. Siegel v. NLRB*, 328 F.2d 25 (2d Cir. 1964), we held that an employer violates § 8(a)(1) if he bludgeons his employees into furnishing copies of their statements. Such coercion, we reasoned, inhibited the workers' right under § 7 to an effective Board investigation of unfair labor practices. Gleason, unlike Siegel, merely requested his workers' statements. But, it seems to me that the tone or careful wording of the employer's wishes may in the end, have the same effect. Indeed, the coercion and chilling effect we decried in *Siegel* inheres in the request itself. The employee cannot fail to be aware that a refusal to comply will be interpreted—and remembered—as an admission that the statement contained matter that he did not wish his employer to see. *See Texas Industries v. NLRB*, 336 F.2d 128, 134 (5th Cir. 1964). And, even if the solicited employee's compliance is purely voluntary, the knowledge that a request has been made will have a corrosive effect on the frankness of *other* employees.

Furthermore, to hold that an employer may not demand his workers' statements will not unduly handicap the employer's preparation for the hearing.[1] When the General Counsel calls an employee as a witness, it is the Board's practice to provide the employer forthwith with a copy of the employee's statement. 29 C.F.R. § 102.-118(b). And, where circumstances warrant, the employer may obtain a continuance to meet surprise testimony. *Retail Clerks Int'l Ass'n v. NLRB*, 125 U.S.App.D.C. 389, 373 F.2d 655, 658 (D.C. Cir. 1967). Finally, the employer may interview his workers before the hearing, concerning matters relevant to the complaint. Such questioning sweeps far less broadly than a request for Board statements since the Board investigator must, if he is effectively to ascertain all possible violations and prepare the complaint, ask the worker questions concerning a wide range of union activities and potential witnesses. *Cf. IBM v. Edelstein*, 526 F.2d 37, 41–44 (2d Cir. 1975).

Finally, to hold that Gleason's conduct is not a § 8(a)(1) violation runs counter both to firmly established Board precedent and to the decisions and reasoning of several circuits. A long line of Board cases, to which we must accord some deference, *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), has held requests such as Gleason's to be inherently coercive and therefore unlawful, *e.g., Bayliner Marine Corp.*, 215 NLRB 11 (1975); *Kay Corp.*, 209 NLRB 11 (1974); *Waggoner Corp.*, 162 NLRB 1161 (1967); *Braswell Motor Freight Lines*, 156 NLRB 671 (1966), *enforced* 386 F.2d 190 (6th Cir. 1967). Moreover, Board orders based on this rationale have been upheld by several circuits. These courts rested their holdings upon the very grounds that should mandate enforcement in this case: (1) the compulsion latent in any request for statements and (2) the availability to the employer of less drastic alternatives, such as interviews with the employees. *Texas Ind. v. NLRB, supra; NLRB v. Winn-Dixie, Inc.*, 341 F.2d 750 (6th Cir.), *cert. denied*, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); *Surprenant Mfg. Co. v. NLRB*, 341 F.2d 756 (6th Cir. 1965); *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452

---

1. It is not insignificant that, even were this an ordinary civil case, investigatory reports such as those Gleason requested would be immune from pre-trial discovery. *See IBM v. Edelstein*, 526 F.2d 37, 41–44 (2d Cir. 1975).

(6th Cir. 1967); *Retail Clerks Int'l Ass'n v. NLRB, supra.*

I do not agree that *Robertshaw Controls Co., Lux Time Div. v. NLRB*, 483 F.2d 762 (4th Cir. 1973), cited by the majority, is at variance. In that case, five employees sought relief from the Company after they allegedly were harassed by organizers for a labor union. The personnel manager of the Company responded by reprimanding the union activists. The Board subsequently investigated the disciplining by the Company of the union organizers, and received statements from the five workers who had complained against the union recruiters. At the Company's request, the five satisfied employees, who had from the inception looked to the Company for its protection, yielded copies of the statements they had made to the NLRB investigators. These employees, whose *sua sponte* complaints had precipitated the reprimand of the union proselytizers, obviously wished to help the Company defend its action taken at their behest. Accordingly, the court properly found no coercion inherent in the Company's requests for copies of its "allies'" statements to the Board. For these reasons, the court stressed that it "reach[ed] the decision in this case upon its *particular* and somewhat *unusual* facts." 483 F.2d at 770 (emphasis added). To extend the *Robertshaw* rationale to cover the strikingly different factual setting of this case [2] would be to push it beyond the limit of its logic.

---

**2.** As the majority notes, Gallagher and Phillips ultimately testified in the company's behalf. The Connellys, however, did not. It is also significant that Gleason apparently requested the statements of Gallagher and Phillips *before* they agreed to testify.